## Richmond.

### KIRSCHBAUM & CO. v. BLAIR AND OTHERS.

#### JANUARY 25, 1900.

1. PRINCIPAL AND SURETY—*Contracts—How Construed—Case at Bar.*—A surety is as much bound by the *terms* of his contract as the principal, and, in ascertaining what the contract is, or the meaning and effect of the language used, the same rules apply to the one as to the other. But, having ascertained what the contract is, he is bound by this alone. There is no implied liability resting on him. His liability is always *strictissimi juris,* and is not to be extended by implication or construction. To the extent, in the manner, and under the circumstances pointed out in the contract, he is bound, but no further. His undertaking is not to be extended beyond the fair scope of the terms of the contract. Any variation in his agreement made without his knowledge or consent, which may prejudice him, or which may amount to the substitution of a new agreement for the one made by him, will discharge him. In the case at bar the sureties guaranteed such advances to their principal as might, in the judgment of the creditor, "be warranted by his (principal's) accepted sales." There were practically no accepted sales at the time large advances were made, and hence the advances were not "warranted by accepted sales," and the sureties are not bound therefor.

Error to a judgment of the Law and Equity Court of the city of Richmond, rendered February 3, 1898, in a proceeding by motion for a judgment, wherein the plaintiffs in error were the plaintiffs, and the defendants in error were the defendants.

*Affirmed.*

The opinion states the case.

*J. R. V. Daniel* and *Coke & Pickrell,* for the plaintiffs in error.

*Leake & Carter*, for the defendants in error.

Cardwell, J., delivered the opinion of the court.

This is a writ of error to a judgment of the Law and Equity Court of the city of Richmond, and the facts of the case out of which the suit arises are practically uncontroverted. They are as follows:

W. H. Weisiger and S. M. Weisiger, of Richmond, Va., styling themselves W. H. Weisiger & Bro., or Weisiger & Bro., as they will be spoken of in this opinion, entered into a written contract with A. B. Kirschbaum & Co., wholesale clothing merchants of the city of Philadelphia, whereby Weisiger & Bro. agreed to travel for and sell the clothing of Kirschbaum & Co. in the States of North Carolina, Virginia, part of West Virginia, and adjacent territory, as directed by Kirschbaum & Co., and from a line of samples, and according to the prices and terms given by them to Weisiger & Bro.; Kirschbaum & Co. on their part agreeing to pay Weisiger & Bro. a commission of eight *per cent.* on all their shipped sales paid for by customers, and further agreeing to advance to Weisiger & Bro., from time to time, money for travelling and personal expenses as might, in Kirschbaum & Co.'s judgment, be warranted by accepted sales made by Weisiger & Bro. All such advances, however, were to be deducted from the commissions earned by Weisiger & Bro. at the time of final settlement, which, it was stipulated, should be made as nearly as possible at the end of each season, and if Weisiger & Bro. should not, by the commissions on their joint sales, earn the amount of money so advanced, then they were to be severally and jointly responsible for the sum of money so advanced and not earned under the contract. Weisiger & Bro. agreed to give satisfactory security in the sum of $2,000 that these advances should be promptly returned to Kirschbaum & Co. at any time within sixty days of their notification by

Kirschbaum & Co. of a desire for a settlement. By a subsequent provision in the contract, Kirschbaum & Co. reserved the right to reject all or part of any orders, at their own discretion, that might be sent in by Weisiger & Bro., and it was agreed that such rejected orders, as well as merchandise returned by customers, and "failed accounts," should not be considered as sales under the contract, and that, if commissions had been paid on orders where the goods were returned or where the customers afterwards failed, the commissions so paid should be promptly returned to Kirschbaum & Co. by Weisiger & Bro., or their sureties. It was further provided that the contract should remain in force for one year, commencing December 1, 1894.

Pursuant to the contract, Weisiger & Bro., in the form of a bond, bearing the same date of the contract, namely, November 24, 1894, gave the security required, Lewis H. Blair and T. A. Jacobs becoming their sureties. The bond was conditioned for the faithful performance by Weisiger & Bro. of all the covenants and conditions of the contract; the contract being referred to and made a part of the bond.

The contract having been made and the bond given, Weisiger & Bro., who had been furnished by Kirschbaum & Co. with a line of samples and lists of prices of the goods to be sold by them, proceeded, in accordance with the contract, to travel and sell the clothing of Kirschbaum & Co. in the territory named, and continued to do so throughout the year beginning December 1, 1894. In the meantime, however, Kirschbaum & Co. had advanced Weisiger & Co. from time to time considerable sums of money. On October 1, 1895, Kirschbaum & Co. gave Weisiger & Bro. sixty days' notice, as provided for in the contract, that they required a settlement of the accounts between them, and at the same time gave the sureties, Blair and Jacobs, like notice. After some delay, caused in part by the sudden death of W. H. Weisiger, a complete account of the transactions between Weisiger & Bro. and Kirschbaum & Co. was made up by

the latter.   The account consists of two parts: First, an itemized statement of the sums advanced by Kirschbaum & Co. from time to time to Weisiger & Bro. for travelling and personal expenses, or paid them on account; and, second, a statement of all the sales made by Weisiger & Bro., upon which they were entitled to eight *per cent.* commission under the contract, and the balance thereby found to be due Kirschbaum & Co. was $1,353.86 upon which they claimed interest from January 1, 1896.

The estate of W. H. Weisiger being insolvent, and S. M. Weisiger being unable to pay the amount claimed by Kirschbaum & Co. on the account rendered, demand was made by them on the sureties on the bond given by Weisiger & Bro. for the payment of the balance of $1,353.86, with interest shown to be due Kirschbaum & Co. by the account, and the sureties, Blair and Jacobs, refusing to pay this balance, this suit was instituted, and at the trial thereof there was a verdict and judgment for the defendants, and the case is before us upon a writ of error.

It appears that on November 29, 1894, Kirschbaum & Co. advanced to Weisiger & Bro. $100, and on the 3d of December, 1894, $400, which amounts were used by Weisiger & Bro., it is claimed, in purchasing railroad mileage books, and by February 11, 1895, their advancements to Weisiger & Bro. aggregated $1,368, when the gross sales made by them, none of which had been accepted by Kirschbaum & Co., amounted to only $53.50.

It further appears that the total sales made by Weisiger & Co., accepted by Kirschbaum & Co., amounted to only $11,522.25, upon which they were entitled to commissions at eight *per cent.*, $921.78, while the total advancements made to them amounted to $2,275.64.

It was contended by Blair and Jacobs, the sureties for Weisiger & Bro., that the advancements, or the greater part of them, made by Kirschbaum & Co. to Weisiger & Bro. were not authorized by the terms of the contract between the parties, and

that therefore they, as the sureties on the bond, were not bound for the balance claimed by Kirschbaum & Co. and sued for in this action.

At the trial, the plaintiffs asked for five instructions, and the defendants also asked for five instructions, all of which were refused except the defendants' first instruction, which is as follows:

"Any dealings between the principal debtor and the creditor which varies the situation, right or remedies of the surety after the contract is made will release him; and if the jury believe from the evidence that the plaintiffs made a contract with the Weisigers which, on its face, was not to go into force until the 1st of December, 1894, and which provided that the money which was to be advanced under its provisions to said Weisigers, and for the return of which, under certain conditions, the defendants were to be bound as sureties, was to be advanced from time to time, 'as may in the judgment of the plaintiffs be warranted by accepted sales' made by said Weisigers for said plaintiffs, and that the plaintiffs advanced money to the said Weisigers before the 1st day of December, 1894, and before there were any accepted sales, without the knowledge or consent of said defendants, these facts operate as a release of the sureties, and the jury should find for the defendants."

Plaintiffs' exceptions to the action of the lower court in giving the above instruction, and in refusing the five instructions asked for on their behalf, present the only question that need be considered, viz: What is a proper construction of the contract between the parties?

While, as contended by counsel for plaintiffs in error, the contract of a surety or guarantor being just as legal as that of the principal, there is no good reason for holding that, in arriving at the intention of the parties, one set of rules shall govern when the principal, another when the surety or guaran-

tor, is concerned, that is to say, that a certain set of words in a contract mean one thing when the principal is defendant, and that the same words in the same contract mean another thing simply because the defendant is a surety or guarantor, is absurd, and while the meaning of the words is not to be affected by the fact that the party sought to be charged is principal, surety or grantor (Brandt on S. & G., Sec. 94; *Gates* v. *McKee*, 13 N. Y. 232; *Belloni* v. *Freeborn*, 63 N. Y. 388; *Collier* v. *So. Ex. Co.*, 32 Gratt. 718), yet the authorities cited do not stop there. Brandt on S. & G., continuing, in section 94, says: " On the other hand, a surety or guarantor usually derives no benefit from his contract. His object generally is to befriend the principal. In most cases the consideration moves to the principal, and he would be liable upon an implied contract, while the surety or guarantor is only liable because he has agreed to become so. He is bound by his agreement, and nothing else. No implied liability exists to charge him. It has been repeatedly decided that he is under no moral obligation to pay the debt of his principal. Being bound by his agreement alone, and deriving no benefit from the transaction, it is eminently just and proper that he should be a favorite of the law, and have a right to stand upon the strict terms of his obligation. To charge him beyond its terms, or to permit it to be altered without his consent, would be, not to enforce the contract made by him, but to make another for him."

It is also well settled that, in the construction of the contract of a surety or guarantor, as well as of every other contract, the true question is, what was the intention of the parties as disclosed by the instrument read in the light of the surrounding circumstances? But when the contract of a guarantor or surety is duly ascertained and understood from the written language in which he has contracted, the case must be brought strictly within the guaranty, and the liability of the surety cannot be extended by implication. His liability is always *strictissimi*

*juris*, and cannot be extended by construction. To the extent, and in the manner, and under the circumstances pointed out in his obligation, he is bound, and no further. The undertaking of the surety is to receive a strict interpretation, and is not to be extended beyond the fair scope of its terms. *McClusky* v. *Cromwell*, 1 Kernan 598; *Smith* v. *U. S.*, 2 Wall. 237; *Blanton* v. *Commonwealth*, 91 Va. 1; *Ayers* v. *Hite*, 97 Va. 466, and authorities cited.

There would seem to be some conflict between the authorities just cited and the authorities cited by counsel for the plaintiffs in error in support of their contention that the instrument in this case is to be liberally construed, but there is really none. Mr. Justice Story, in *Lawrence* v. *McCalmont*, 2 How. 426, does say: " We have no difficulty whatsoever in saying that instruments of this sort (letters of credit) should receive a liberal interpretation," but, says he, " by a liberal construction we do not mean that the words should be forced out of their natural meaning, but simply that the words should receive a fair and reasonable interpretation, so as to attain the objects for which the instrument is designed, and the purposes to which it is to be applied."

In *Gates* v. *McKee, supra*, Denio, J., refers, with approval, to *Lawrence* v. *McCalmont*—quoting at length from Story, J.— and to other authorities, to sustain the view that there is no reason for putting on a guaranty a construction different from what is put on any other instrument; that with regard to other instruments, the rule is that if the party executing leaves anything ambiguous in his expressions, such ambiguity must be taken most strongly against himself, but he adds: " There is a sense undoubtedly, in which it may be said these obligations (of sureties) are to be strictly construed, and it is this: That the surety is not to be held beyond the very precise stipulations of his contract. But where the question is as to the meaning of the written language in which he has contracted, there is no differ-

ence, and there ought not to be any, between the contract of a surety and that of any other party." To the same effect is the decision of the court in *Belloni* v. *Freeborn, supra,* and other cases cited by plaintiffs in error.

The writing may be read in the light of the surrounding circumstances in order more perfectly to understand the intent and meaning of the parties; but, as they have constituted the writing the only outward and reliable expression of their meaning, *no other words* are to be added to it, or substituted in its stead. The duty of the court in such cases is to ascertain, not what the parties may have secretly intended, as contra-distinguished from what their words expressed, but the meaning of the words they have used. 1 Green, Ev., Sec. 277.

As said by Mr. Justice Strong, in *Maryland* v. *R. R. Co.,* 22 Wall. 113: " Ordinarily a reference to what are called 'surrounding circumstances' is allowed for the purpose of ascertaining the subject matter of a contract, or for an explanation of the terms used, not for the purpose of adding a new and distinct undertaking."

In the case at bar the clause in the contract, especially in dispute, reads: " The firm (Kirschbaum & Co.) further agrees to advance to the said W. H. Weisiger & Bro. from time to time money for travelling and personal expenses, as may in their judgment be warranted by his accepted sales."

Plaintiffs in error accept as correct the rule of law laid down in *Ex. Building, &c., Co.* v. *Bayless,* 91 Va. 134; *Blanton* v. *Commonwealth, supra; Ayers* v. *Hite, supra,* but contend that when the contract is " fairly and reasonably interpreted, according to the intent of the parties as disclosed by the instrument, read in the light of surrounding circumstances and the purposes for which it was made," they were authorized to make the advancements in question without regard to the "accepted sales" made by Weisiger & Bro. This view is the trend of the instructions asked for by plaintiffs in error at the trial, and refused by

the court. If that construction of the contract is to prevail, the undertaking by the bond was in no way limited either by the contract as a whole, or the words: " The firm further agrees to advance to the said W. H. Weisiger & Bro. from time to time money for travelling and personal expenses, as may, in their judgment, be warranted by his (their W. & Bro.) accepted sales." It is necessary to that construction to strike out the words quoted, or to give them no meaning or import. But say plaintiffs in error, they are entitled to force and effect, and left it to their judgment to say what advancements they might make to Weisiger & Bro., and when, their prime object being to make large sales and profits, and the contract and security was as to them a secondary consideration. This may have been the purpose and aim of plaintiffs in error, but it is not, by any reasonable construction, what the language employed in the contract means. There is nothing in the contract to justify a broader liability on the defendants in error, as sureties on the bond, than for advances "warranted by accepted sales"—warranted, or justified, in the judgment of plaintiffs in error, fairly and honestly exercised, as defendants in error had a right to rely, by "accepted sales"; all such advances to be deducted from the commissions earned by Weisiger & Bro., at the time of final settlement; and if not earned by them on their joint sales, they were to be jointly and severally bound for the sums so advanced, as well as for commissions which had been paid to them upon sales of goods returned to plaintiffs in error, and Weisiger & Bro., or their sureties, defendants in error, were to repay such advancements and commissions.

We do not say, and do not mean to say, that plaintiffs in error were not authorized to advance to Weisiger & Bro., under the contract, any sum or sums of money beyond the commissions on their "accepted sales," but we do say that plaintiffs in error were not authorized to make any advances to Weisiger & Bro. not "warranted," in the judgment of the plaintiffs in error, by

"accepted sales" made by Weisiger & Bro. Indeed this seems to have been the view taken by them when they wrote to W. H. Weisiger March 9, 1895: " You (Weisiger) know you have drawn at least $1,000 more than what you are entitled to according to your sales," and they also admit in the same letter that they had already been advancing money to Weisiger & Bro. for "private purposes," and were not authorized to make any advances except for " business purposes." Why refer in that letter to the restrictions upon the right of Weisiger & Bro. to draw advancements, if they had the right to ask, and plaintiffs in error the right to make advancements, regardless of the sales made by Weisiger & Bro.? Why put the clause in the contract if it was only to serve the purpose of reserving the right to plaintiffs in error to exercise their judgment as to what advances they would make to Weisiger & Bro., and when? They had that right already without such a stipulation.

Plaintiffs in error were wholesale merchants, widely known, conducting a very large business, extending over many States, and it was reasonable for defendants in error to rely, and doubtless they did rely, for their protection, as sureties for Weisiger & Bro., upon the restriction in the contract of advancements to the latter to such as would be "warranted," in the judgment of plaintiffs in error, fairly and honestly exercised, by "accepted sales," made by Weisiger & Bro. There is nothing in the contract, as plaintiffs in error seem to contend was their situation, to have led defendants in error to the belief that Weisiger & Bro. were in straitened circumstances, and unable to work without considerable advances from plaintiffs in error. On the contrary, the language of the contract was well calculated to justify the belief, as testified to by one of the defendants in error, that Weisiger & Bro. had sufficient money to travel and sell goods for plaintiffs in error until there were "accepted sales." We agree with counsel for defendants in error that it is a very different thing to become surety for the return of advances by a

man circumstanced as plaintiffs in error claims their agents (W. & B.) were—unable even to begin their work without receiving large advances—and to become surety for one situated as the sureties here had the right to believe from the contract Weisiger & Bro. were, to wit: Possessed of enough means to carry on the business until there were "accepted sales" sufficient to justify advances.

In *Blanton* v. *Commonwealth, supra,* Keith, P., says: " The correct rule, says the Supreme Court of the United States (2 Wall., *supra*), is that any variation in the agreement to which the surety has subscribed, which was made without the surety's knowledge or consent, and which may prejudice him, or which may amount to a substitution of a new agreement for the one subscribed, will discharge the surety."

In that case the sureties subscribed to a bond duly accepted by the County Court of Amelia county, in which their liability was divided among eight, while the attempt was made to enforce a liability upon a bond in which there were but seven obligors, and it was held that the sureties were not bound. See also *Calvert* v. *London Dock Co.,* 2 Keen, 639; *Mayhew* v. *Boyd,* 5 Md. 110; *Bragg* v. *Shain,* 49 Cal. 131; *Simonson* v. *Grant,* 36 Minn. 439.

The question in the last case cited was whether or not the sureties upon a bond for the faithful performance of the provisions of a builder's contract were discharged by the owner of the house making payments to the builder at times before they were due under the contract. The grounds upon which the court held the sureties discharged were that, after the work was commenced, and the first instalment of the contract price paid, and before the building materials were furnished by the contractors, the owner of the house so far departed from the terms of the contract that payments were made by him to divers persons on the order of the contractors, without reference to the state of the work or the terms of the contract, and in some instances to

an amount exceeding the instalments due, as stipulated therein, and in anticipation thereof.

In this case, with a provision in the contract authorizing advances to Weisiger & Bro., when "warranted" by their "accepted sales," plaintiffs in error not only seek to enforce a liability on defendants in error for large advances to their principals, for private as well as business purposes, before there were "accepted sales"—advances before there were any sales at all—but also an advance before the contract went into effect. To enforce this demand it would have to be held that a surety was bound for what his principal was bound, although it is conceded that his liability is *strictissimi juris,* and that to the extent, and in the manner, and under the circumstances pointed out in his obligation, he is bound, and no further.

We are of opinion that the court below did not err in refusing the instructions asked by plaintiffs in error and giving the instructions set out above. Nor did the court err in refusing plaintiffs in error a new trial. Therefore its judgment is affirmed.

*Affirmed.*

Keith, P., and Riely, J., dissent.