# 𝔖taunton

AMERICAN SURETY COMPANY v. PLANK & WHITSETT, INC.,
ET ALS.

September 22, 1932.

Present, Campbell, C. J., and Holt, Hudgins, Gregory and
Browning, JJ.

1

The opinion states the case.

*Caldwell, Chaney & Loyd* and *W. J. Henson,* for the appellant.

*R. C. Jackson* and *J. P. Saul, Jr.,* for the appellees.

HUDGINS, J., delivered the opinion of the court.

## Statement of Facts

Mrs. May B. Cooper and Mrs. Ruth C. Whitsett were the owners of two lots, one in Salem and one in Blacksburg. They made a contract with Plank & Whitsett, Inc., wherein the corporation agreed to bear a part of the cost of the

erection of a theater building in Salem and lease it after completion, with an option to purchase. A similar contract was made with Blacksburg Realty Corporation for the erection and leasing of a theater building in Blacksburg. All the stock in the two corporations was owned or controlled by the same parties; R. F. Plank was active manager of both corporations.

On April 23, 1929, R. F. Plank, in the name of Plank & Whitsett, Inc., as owners, made a contract with Morris C. Miller & Son, general contractors, for the erection of the theater building on the Salem lot, the cost of which building, including extras, totalled $58,743.65. On the same day R. F. Plank, in the name of Blacksburg Realty Corporation made a similar contract with Morris C. Miller & Son for the erection of a theater building in Blacksburg. The agreed cost of the construction of this building, including extras, totalled $69,918.

For the erection of the theater building in Salem the contractor was required to give bond for the faithful performance of his contract. No such bond was required of the contractor for the erection of the building in Blacksburg. On May 18, 1929, Morris C. Miller & Son, as principal, and American Surety Company, as surety, executed the required bond in the penal sum of $46,000, payable to Plank & Whitsett, Inc., as obligee. The condition of this bond reads thus:

" * * * if the principal shall faithfully perform the contract on his part, and satisfy all claims and demands, incurred for the same, and shall fully indemnify and save harmless the owner from all cost and damage which he may suffer by reason of failure so to do, and shall fully reimburse and repay the owner all outlay and expense which the owner may incur in making good any such default, and shall pay all persons who have contracts directly with the principal for labor or materials, then this obligation shall be null and void; otherwise it shall remain in full force and effect."

The contract contained the following provisions for payments to be made the contractor:

"On or about the tenth day of each month eighty-five per cent of the value, based on the contract prices, of labor and materials incorporated in the work and of material suitably stored at the site thereof up to the first day of that month, as estimated by the architect, less the aggregate of previous payments; and upon substantial completion of the entire work a sum sufficient to increase the total payments to eighty-five per cent of the contract price.

" * * * Final payment shall be due fifteen days after substantial completion of the work, provided the work be then fully completed and the contract fully performed. * * *

"Before issuance of final certificate the contractor shall submit evidence satisfactory to the architect that all pay rolls, material bills, and other indebtedness connected with the work have been paid."

Before any payments became due under either contract and on the same day that the bond was executed, the owners loaned to Morris C. Miller & Son $5,000, and by July 20th had increased the amount of this loan to $35,000, which sum was evidenced by four notes—No. 1 dated May 18, for $5,000; No. 2 dated May 27, for $15,000; No. 3 dated June 24, for $5,000; and No. 4 dated July 20, for $10,000—all payable to Plank & Whitsett and signed by Morris C. Miller & Son. It was agreed that these notes should be paid by deducting $4,000 a month, beginning July 1st, from the sums to become due the contractor for the erection of either, or both, buildings. By October 10, 1929, $20,000 of the $35,000 had been collected in this manner.

On October 19, 1929, Plank & Whitsett answered the following questions, submitted to them by the surety, thus:

"Has the contract been fully and satisfactorily completed? No.

"Amount of work completed to date. About half (putting on roof).

"Total amount paid to contractors.   $24,324.60.

"Amount of retained percentage.   15%.

"Have all labor and material bills been paid?   Unable to determine."

Again on January 2, 1930, the same questions were submitted and the same answers given, except it was stated that eighty per cent of the work had been completed and $34,854.60 had been paid the contractor.

On January 12 and 20, 1930, notices were given that unless improvement was made in the progress of the work on the Salem building the owners would take charge and complete the same.   Pursuant to these notices, on January 29, 1930, the owners assumed charge and later completed the building.   Plank & Whitsett thereupon rendered the following account to the contractor and the surety company.

"Original contract amount.......$  46,000.00
Amount added to contract to date.   12,743.65

Total contract to date.....................  $  58,743.65
Total certified prior to Jan. 29, 1930.........   38,444.60

Total uncertified to date...................  $  20,299.05

Total cost of construction after
      Jan. 29/30 ................$  13,759.84
Penalty for 154 days' delay @
      $20.00 ....................   3,080.00
Claims by owner for unpaid
      balance of advanced amount
      to M. C. Miller & Son.......   9,709.00
Total due owner .......................  $  26,548.34
Total uncertified to date .................   20,299.05

Balance due by Miller & Son..............  $   6,249.29"

Upon the default of the contractor it appeared that $18,000 was due by the contractor for unpaid bills for labor

performed and material used in the Salem building. Parties holding these claims took the necessary steps to perfect mechanics' liens and filed suit against the owners, Plank & Whitsett, Inc., the contractor and American Surety Company to enforce their liens against the building and to obtain judgment against the contractor and the surety.

The trial court held that, by reason of advances made, the owners were not liable to the contractor, and hence the laborers and materialmen were entitled to no liens on the building, but gave judgment for the amount of the claims against the contractor and the surety. No appeal was sought from this decree. The surety company paid the judgments and immediately filed an answer and cross-bill, claiming that it was entitled to reimbursement from the owners for the sum of $18,000 and $108.68 costs. From an adverse decree the surety appealed.

## Opinion

The surety contends that it is entitled to reimbursement from the owners because they changed the terms of the contract by making large premature payments to the contractor and failing to retain fifteen per cent of the agreed costs of construction, and in so doing were guilty of bad faith, amounting to fraud.

The appellees urged in the trial court that the payments made in advance by the owners to the contractor and the failure to retain the required percentage were mere alterations or modifications of the terms of payment and were within the reasonable scope of the following provision of the bond:

"Any alterations which may be made in the terms of the contract, or in the work to be done under it, or the giving by the owner of any extension of time for the performance of the contract, or any other forbearance on the part of either the owner or the principal to the other shall not in any way release the principal and the surety or

sureties, or either or any of them, their heirs, executors, administrators, successors or assigns from·their liability hereunder, notice to the surety or sureties of any such alteration, extension or forbearance being hereby waived."

Counsel for appellees, in his oral argument, was commendably frank in stating, in substance, that when this case was presented to the court below, the decision in *Fort Worth Independent School District* v. *Aetna Casualty & Surety Company* (C. C. A.), 48 Fed. (2d) 1, 77 A. L. R. 222, was not available to him or to the trial judge, and that that opinion convinced him that the excessive payments and the failure to retain the required percentage constituted such material modifications and alterations in the terms of payment that the surety was discharged from its obligation to the owners, and was entitled to reimbursement from them to the extent of the percentage they were required by the contract to retain, and to that extent error was confessed.

The main question this concession leaves to be determined is: Is the surety entitled to recover from the owners any sum in excess of the percentage required to be retained?

The owners, in consideration of a certain definite sum to be paid the contractor, were entitled to have erected upon their lot a building conforming to certain plans and specifications. Such a building the contractor promised to erect. Both parties knew that in the construction of the building it would be necessary for the contractor to incur obligations to the men who performed the work and those who furnished the materials. For the successful performance of these undertakings the owners were unwilling to accept the responsibility of the contractor alone. The American Surety Company, in consideration of payment to it of a premium of $690, undertook to be responsible for the faithful performance of the obligation of the contractor, both to the owners and to the workmen and materialmen.

It is quite generally held that a contract of this nature, executed by a corporation which for a monetary consideration becomes sponsor for others, contains the es-

sential elements of an insurance contract, and is construed accordingly. ·*American Surety Co.* v. *Pauly*, 170 U. S. 133, 18 S. Ct. 552, 42 L. Ed. 977; *U. S. Fidelity & Guaranty Co.* v. *U. S.*, 191 U. S. 416, 24 S. Ct. 142, 48 L. Ed. 242; *U. S.* v. *American Surety Co.*, 200 U. S. 197, 26 S. Ct. 168, 50 L. Ed. 437; *Board of Commissioners of Ohio County* v. *Clemens*, 85 W. Va. 11,Ⴞ100 S. E. 680, 7 A. L. R. 373; *Royal Indemnity Co.* v. *Northern Granite & Stone Co.*, 100 Ohio St. 373, 126 N. E. 405, 12 A. L. R. 378, and note; *City of Montpelier* v. *Nat. Surety Co.*, 97 Vt. 111, 122 Atl. 484, 33 A. L. R. 489; 21 R. C. L. 1160. See, also, *Hormel & Co.* v. *American Bonding Co.*, 112 Minn. 288, 128 N. W. 12, 33 L. R. A. (N. S.) 513, and note; *Brown* v. *Title Guaranty & Surety Co.*, 232 Pa. 337, 81 Atl. 410, 38 L. R. A. (N. S.) 698; *Costello* v. *Bridges*, 81 Wash. 192, 142 Pac. 687, L. R. A. 1915A, 853; *Physician's Defense Co.* v. *Cooper* (C. C. A.), 199 Fed. 576, 47 L. R. A. (N. S.) 290, and note.

█ Before the owners are entitled to recover for any loss which they have incurred by reason of the default of the contractor, they must show that they have performed the conditions under which the surety has promised to recompense them for loss suffered. These conditions are payments to the contractor in accordance with the terms of the contract. Payments of substantial sums before they are due, or failure to retain the required percentage, are generally held to be such variations in the terms of the contract as will discharge the surety from its obligation to the owners. *Granite Building Co.* v. *Saville's Adm'r*, 101 Va. 217, 43 S. E. 351; *First Nat. Bank of Montgomery* v. *Fidelity & Deposit Co. of Maryland*, 145 Ala. 335, 40 So. 415, 5 L. R. A. (N. S.) 418, 117 Am. St. Rep. 45, 8 Ann. Cas. 241, and note; *Morgan* v. *Salmon*, 18 N. M. 72, 135 Pac. 553, L. R. A. 1915B, 407, and note; *Standard Asphalt & Rubber Co.* v. *Texas Building Co., etc.*, 99 Kan. 567, 162 Pac. 299, L. R. A. 1917C, 490; *Fort Worth Independent School District* v. *Aetna Casualty & Surety Co.* (C. C. A.), 48 Fed. (2d) 1, 3, 77 A. L. R. 222.

In the case at bar, the owners failed to show that they had complied with the terms of the agreement, and hence the surety was released from its obligation to them.

█ Subcontractors, laborers and materialmen, before they can recover for a default of the contractor in his obligation to them, must show compliance with the required conditions, *i. e.*, that they have performed work upon the building or furnished materials in accordance with the plans and specifications. See *Fidelity & Deposit Co. of Baltimore* v. *Rainer*, 220 Ala. 262, 125 So. 55, 77 A. L. R. 13, an extended note follows this case in which numerous authorities are reviewed; *C. S. Luck & Sons* v. *Boatwright*, 157 Va. 490, 162 S. E. 53. Performance of these conditions was shown in this case, and hence subcontractors, laborers and materialmen were entitled to, and did, recover.

█ The rights of owners and laborers or materialmen, where the latter are protected by the provisions of the bond, are independent of each other. No variation or modification of the contract by mutual agreement of the owners and the contractor, even with the consent of the surety, will release the latter from its obligation to pay claims for labor and material, in the event the contractor defaults in such payments. See *Standard Asphalt & Rubber Co.* v. *Texas Building Co., supra,* and other cases cited above.

█ The surety admitted its dual obligation and did not appeal from the decree ordering it to pay the claims for labor and materials furnished the contractor, but it contends that the owners should be compelled to reimburse it for all sums so paid.

One of the grounds upon which this contention is based is that premature payments and failure to retain the fifteen per cent "stand on the same footing and constitute violation of the contract, for which the owners are liable to the appellant." We think this contention unsound. By the express terms of the surety's obligation it voluntarily assumed the risk that the contractor would default in the

payment of his obligations to the workmen and material-men, and in paying these claims the surety has done nothing which it did not obligate itself to do.

Reference to the terms and conditions which control payments to the contractor will reveal that there are no restrictions attached to the eighty-five per cent which the owners were to pay the contractor as the work progressed. The owners, by the stipulations of the contract, were bound to pay the eighty-five per cent on receipt of certificates of the architect, but the contract imposed no obligation upon them to see that any part of it was used to pay debts due by the contractor for labor and materials. By the express terms of the contract the owners were required to retain fifteen per cent of the cost of construction, which should be paid to the contractor only in the event that he submitted "evidence satisfactory to the architect that all pay rolls, material bills, and other indebtedness connected with the work have been paid."

The fund created by this retained percentage was required not only as a protection to the owners, to be used in the event that the contractor defaulted in any of his obligations to them, but as a fund out of which the surety might be paid, in the event that it elected to complete the building after the default of the contractor, and out of which they had a right to be reimbursed for the payments they might be compelled to make laborers and materialmen. In other words, by the express terms of the agreement the surety was given an equitable interest in this retained per-centage, which could not be diverted without its consent. This is the theory upon which it is generally held that sureties are entitled to reimbursement from the owners out of the retained percentage. *Prairie State Nat. Bank* v. *U. S.,* 164 U. S. 227, 17 S. Ct. 142, 41 L. Ed. 412; *State* v. *Schlesinger,* 114 Ohio St. 323, 151 N. E. 177, 45 A. L. R. 371, and note. See *Morgan* v. *Salmon, supra,* and note; *Fidelity & Casualty Co. of N. Y.* v. *Copenhaver Contracting Co., post,* page 126, 165 S. E. 528; *County of Wasco* v. *New*

*England Equitable Insurance Co.*, 88 Or. 465, 172 Pac. 126, L. R. A. 1918D, 732, Ann. Cas. 1918E, 656; *First Nat. Bank* v. *Fidelity & Deposit Co., supra.*

Both sides concede that the decision in *Fort Worth Independent School District* v. *Aetna Casualty & Surety Co., supra,* is sound and should be followed. The question there involved was the right of a surety, who had paid claims due by the contractor for labor and materials, to recover from the school district the full percentage required to be retained, which the school district had paid to the contractor in violation of the terms of payment set out in the contract. Speaking to the point, the court said:

"It is not a suit upon contract or express obligation to pay by the school board, but arises from equitable subrogation to the rights of laborers and materialmen (who, although not parties to the contract and bond, were nevertheless beneficiaries thereunder) as well as from the alleged duty of the school board to properly administer and account for the funds which were specially set apart to pay for this work."

Although the amount which the Aetna Casualty and Surety Company was compelled to pay to such third parties by reason of the default of the general contractor exceeded the amount of percentage required to be retained, no claim seems to have been made upon the school district for any sum in excess of the retained percentage.

The case under consideration differs from the above case in that bad faith, amounting to fraud, is relied upon to eliminate certain payments the owners now claim were made to the contractor. This element is clearly established by the following uncontradicted evidence:

(a) The owners, through two separate and distinct corporations, made two contracts with the same contractor for the erection of two buildings, one in Salem and one in Blacksburg. For the erection of the less expensive building they required the contractor to give bond, with surety. For the erection of the other building no bond was required.

The contracts were so written that payments under both became due at the same time and were made by one check.

Large advancements in the form of loans were made in the name of Plank & Whitsett, Inc., the corporation which required a surety bond, and while the contractor was required to agree to use the proceeds of the loans in the erection of the two buildings, he was at liberty to use any part, or all of it, on either building. In making the loans, the owners reserved the right to collect the same by deducting the amount loaned from the payments to become due on either or both undertakings, and prior to default of the contractor they had collected $20,000. In making these collections, the owners had taken the sum of the payments as they became due under both contracts and from this amount had made deductions. No separate account was kept of the amount deducted from either contract, and the only way to ascertain the exact amount deducted from the payments in which the surety was interested is by proportion. By these arrangements, the owners were in a position to charge the total amount of the loans to the account of the contract on which the surety was bound.

(b)  The owners were requested to, and did, report to the surety the progress of the building, the amount of money they had paid the contractor and the amount retained, and in both of their reports it was stated, in effect, that they were paying the contractor strictly according to the terms of payment set out in the contract and were retaining the required percentage. If the loans are considered as premature payments these reports were false and misleading.

(c)  When it became apparent that the contractor would be unable to complete the building at Salem, the owners, acting under their secret arrangement with the contractor, induced the architect to charge as advances on the Salem building the balance ($12,850) then due on the loans,

and in so doing wrote a letter in which the bad faith of the owners is clearly apparent. (See foot note.)

(d) The owners in their dealings with the surety treated the loans as a separate and independent transaction, as evidenced by their report, but when they were confronted with the claims for labor and material incorporated in the Salem building they treated these loans as advance payments on the contract for the erection of this building. Under our mechanics' lien statutes the owners are under no legal duty to protect the interests of workmen and materialmen until they have taken steps to protect themselves by filing mechanics' liens and giving the required notice. So construing the loans, the owners escaped all liability to subcontractors, laborers and materialmen.

The owners knew, or were charged with knowledge, that by the provisions of the bond which they had required the surety to give, the surety was responsible to workmen and materialmen in the event the contractor failed to pay

---

"BLACKSBURG, VA., *January* 22, 1930.
"MR. MORRIS C. MILLER,
　　"*Wytheville, Virginia.*
"DEAR MR. MILLER:

"At the suggestion of Mr. Boynton, I am enclosing a letter which he wishes you to sign, if you feel so disposed as he believes it will be of much assistance to you as well as his office and ourselves.

"You probably recall a letter of Dec. 2nd, authorizing the $15,000 to be deducted from either or both of the jobs at the rate of $5,000 each month. Now, Mr. Boynton has made entry of $12,850 against the Salem job and $2,150 against the Blacksburg job. Your $5,000 which was deducted on Jan. certificate was credited so as to absorb the $2,150 on Blacksburg and the remainder of the $5,000 came off of Salem, his books show that you are still due us from this loan a little less than $10,000 and all of it is on the Salem account at present. Mr. Boynton thinks that if you give him a letter like the one enclosed that if the bonding company investigates his books they will find nothing referring to Blacksburg, and will not know that you are even doing a job in Blacksburg, or if they do there will be no connection with the Salem job in that the two jobs are for two separate concerns. In your case if the bonding company takes any action they will have to assume the $10,000 along with any other obligations you may have contracted and if they do assume the $10,000 it will not have to be retained from future certificates on Blacksburg and thus give you more capital to go ahead with Blacksburg and have all your troubles in one bag. It would really mean that you would

their claims, and it was the duty of the owners to deal fairly, frankly and in good faith with the surety. This they failed to do.

The result is that the surety had no knowledge of the fact that the owners had made large advancements to the contractor and were collecting the money borrowed, by deductions from the payments due the contractor. Under the terms of the loan agreement, the contractor was at liberty to use any part, or all, of the money so advanced on either or both enterprises. The surety was only interested in one of these projects. We do not know how much, if any, of the $35,000 was expended for the erection of the building in Salem. All that the record discloses on the subject is that the contractor testified that he applied the money "on both the Salem and Blacksburg jobs," and in reply to a question asking him if the borrowed money was applied to either or both of these buildings he said:

"In our line of business it would be hard to state just what portion of a certain check would go into the job on which the check was drawn. One month we might use all the money on these two jobs and also some money received

---

have this money to use much longer. It would mean for us that we would not get into legal complications as to where the money should come from which would tie things up much more and place us in an embarrassing position. From Boynton's standpoint it would simplify matters from his book standpoint and also the trouble he would naturally be called upon to go into details about where the present advanced $10,000 should come from. If you have any trouble with the bonding company they would have the whole thing to handle and you would have one action, if any action was taken, against you instead of possible number. You recall that you gave us the right to take this money from either or both jobs so you are doing nothing which you have not done before except Boynton can show them this letter instead of the one bringing in Blacksburg.

"You can do just as you like about signing this letter but I believe it would be best. However, you may have other views and if you do not care to do it, please do not feel under obligations to do so. You understand that this letter does not relieve us from deducting the payments from Blacksburg or Salem if the bonding company fails to include the $10,000 in their settlements.

"Yours very truly,

"BLACKSBURG REALTY CORPN.,
"By R. F. PLANK."

from some other source, and the next month we may use a portion of the money on one job and some on another. The business is carried on like any other business, you have a bank account and you draw it out and pay your bills accumulating or originating from your operations."

The owners dealt with the contractor as if the construction of the two buildings were one undertaking, and it was only when they had cause to believe that the contractor would default that they separated the accounts, and then to the detriment of the surety.

██ While the owners, as pointed out above, were under no legal duty to supervise the disbursement by the contractor of the eighty-five per cent which became due as the building progressed, the promise to pay these sums was an inducement upon which the surety relied in assuming the obligations named in the bond. When the surety is required to make reimbursements for a loss occasioned by the default of the principal, it has a right to require the owners to show how and in what manner they have performed their part of the contract. The owners, as between them and the surety, would have no right to pay the contractor under the terms of the contract by giving him credit for a debt owing them at the time the bond was executed unless the surety before assuming the risk, was informed of this intention, or agreement, between the owners and the contractor. The obligee in the bond is not only required to exercise good faith with the surety at the time the obligations are assumed, but this good faith must be kept inviolate in all subsequent transactions affecting their rights and obligations created by the contract and bond. 21 R. C. L. 989.

██ It follows that when the contractor, subsequent to the acceptance of the bond, becomes indebted to the owners for a purpose entirely foreign to the erection of the building which the surety has guaranteed shall be completed for a definite sum, the owners have no right to pay the contractor by deducting the amount of such debt from

the payments due, or to become due, under the building contract.

Notwithstanding the fact that there is no proof either of how much, if any, of the $35,000 was actually used, or how much was intended to be used, in the construction of the Salem building, the owners claim that they have a right to treat the sum of $24,491 of this amount as a payment on the amount due the contractor for the construction of the Salem building. This claim is urged in spite of the fact that when the loans were actually made it was the intention of both the lender and the borrower that the greater part of the $35,000 should be used in an enterprise in which the surety was not interested, though the owners were.

Under these circumstances, and in view of the relations existing between the surety and the obligee, equity and good conscience require that the total deductions actually made be eliminated; and as these deductions, plus the fifteen per cent which it is conceded the surety is entitled to recover, exceed the amount and costs claimed, a decree for $18,108.68 will be here entered against the owners.

The only other question involved is, whether or not Mrs. May B. Cooper and Mrs. Ruth C. Whitsett are at all liable to the surety.

The commissioner, in his report, stated that Mrs. Cooper and Mrs. Whitsett owned .874 and Plank & Whitsett, Inc., owned .126 undivided interests in the property, and that in making the contract with the contractor and surety Plank & Whitsett was acting for itself to the extent of its interest in the property and as agent for Mrs. Cooper and Mrs. Whitsett to the extent of their interests, and hence both were liable to the contractor.

Without prolonging this opinion by a detailed statement of the evidence, suffice it to say that it fully sustains the conclusion of the commissioner and we fully concur therein. Hence judgment for the surety will be entered against Plank & Whitsett, Inc., May B. Cooper and Ruth C. Whitsett.

*Reversed.*