406 P.2d 248

**STANDARD ACCIDENT INSURANCE CO.,**
a Michigan corporation, Appellant,

v.

**COPPER HILLS MOTOR HOTELS, INC.,**
an Arizona corporation, Appellee.

No. 1 CA–CIV 110.

Court of Appeals of Arizona.

Oct. 7, 1965.

Rehearing Denied Nov. 4, 1965.

Review Granted Dec. 7, 1965.

Jennings, Strouss, Salmon & Trask, by William F. Haug, Gary G. Keltner, Phoenix, for appellant.

Snell & Wilmer, by Thomas E. Parrish, Phoenix, for appellee.

STEVENS, Chief Judge.

Copper Hills Motor Hotels, Inc., a corporation, recovered a judgment on a bond wherein Standard Accident Insurance Co., a corporation, was the surety. The bond was executed to guarantee the payment of laborers and materialmen in connection with the construction of improvements to real property. The surety appeals.

Copper Hills is the owner-operator of a motel. Peter J. Wurts has been the President and General Manager of this corporation at all times material to this opinion. Paramount Builders was a corporation duly licensed as a contractor and at all times material to this opinion, William G. Spurr was its President. In 1960 Copper Hills called for bids for the construction of an addition to the motel. Paramount was the successful bidder and

a contract for the construction was executed on 1 July 1960. The work commenced shortly after the execution of the contract and was completed by mid September of the same year. The contract contained the following provisions:

"3. CONTRACT PRICE AND PAYMENT METHOD.

Owner shall pay to Contractor the sum of $35,500 in consideration of the performance of the obligations undertaken by Contractor herein. The said sum shall be deposited, before commencement of construction, in cash, and/or by the assignment of construction loan proceeds. The entire contract price shall be advanced to Contractor at least as rapidly as set out below:

"1. $10,000.00 when Foundations, 1st floor and rough plumbing is complete.

"2. $7,000.00 when walls are erected and 2d floor is in place.

"3. $7,000.00 when rough framing, electrical, plumbing and sheet metal are complete.

"4. $7,000.00 when ready for paint.

"5. $4,500.00 when complete.

In the process of construction, extras were incurred in the sum of $1,468.85, resulting in an overall contract obligation from Copper Hills to Paramount in the sum of $36,968.85. Pursuant to the terms of the contract, Paramount was obligated to secure a performance bond and this was secured from Standard, Paramount paying the required bond premium. In the bond Paramount was the principle, Standard was the surety and Copper Hills was referred to as the "Owner", being the beneficiary, the bond being in the principal sum of $35,500. The bond provided in part:

"That the Owner shall faithfully and punctually perform all the terms and conditions of said contract to be performed by the Owner."

On the 31st day of May, 1960, Spurr, President of Paramount, requested Wurts', President of Copper Hills, financial assistance and the two men went to a bank where a $10,000 loan was secured, Wurts and Spurr as individuals signing a demand note in that sum. The money was for the use of Paramount in its corporate status. Both Wurts and Spurr intended that the money be repaid in approximately two weeks. The loan was made by the bank on the individual credit of Wurts. Paramount received and used the money in its business, Wurts testifying that he knew that the purpose of the loan was for the immediate corporate needs of Paramount in relation to existing payrolls and current expenses. This was corroborated by the testimony of Spurr. Wurts and Spurr both testified that the fact of the loan had no bearing upon the fact that Paramount was the successful bidder for the enlargement of the motel.

There had been two or three prior loans from Wurts to Spurr's business interests. Wurts was interrogated as to whether or not he had had any prior experience with Spurr in relation to the repayment of previous loans and whether or not it was necessary "to keep after him in order to get him to repay the loans". Wurts replied in the affirmative and also testified that "on all prior occasions, I had found that I had to make several requests for payment; if I did not, the note was prone to continue on, so I had to instigate those actions at that time".

The first three progress payments were made by Copper Hills to Paramount as specified in the contract; $10,000 being paid by check dated 1 August 1960; $7,000 being paid by check dated 4 August 1960; and $7,000 being paid by check dated 16 August 1960. In the meantime, no part of the $10,000 loan had been paid. About this time Wurts asked Spurr (in Spurr's capacity as President of Paramount) if it would be possible for Wurts to apply the funds which were coming · from Copper

Hills to Paramount out of the construction contract to the payment of the note. Wurts testified that "at this time it was past due some amount. I was desirous of retiring the note; having the debt taken care of. I had asked him if he would mind using these funds to pay this obligation to which he concurred". On or about the 22nd day of August, Wurts asked Spurr for the entire $7,000 progress payment which was then due. The $7,000 was disbursed by Copper Hills as follows: (1) a check for $3,846.67 was given to Paramount and by Paramount deposited in its bank account; and (2) a check for $3,153.33 was made payable to Paramount and by Paramount endorsed to Wurts who then deposited the check in his personal account. The $153.33 represented interest which was due on the $10,000 loan. These checks were issued on the 22nd day of August and on the 31st day of August Wurts paid $153.33 in interest to the bank. Wurts did not make a payment on the principal of the debt, he retained the use of the $3,000. When asked why he was unable to secure the entire $7,000 progress payment, Wurts testified that Spurr requested that a portion of it be retained by his corporation to meet current expenses. When asked whether or not Spurr had told him that he needed the money desperately, Wurts replied that he did not recall that terminology although that he realized that the word "desperately" was in the deposition and in any event, Spurr convinced him that he had a need for the money.

On the 9th of September 1960, Copper Hills issued a $2,000 check payable to Wurts which check Wurts endorsed and deposited in his personal account, this check being charged against the money which Copper Hills owed to Paramount on the contract. On the 12th day of September 1960, Paramount paid the sum of $2,000 directly to the bank and this money was applied on the principal on the note. As of that date there remained an unpaid principal balance due to the bank in

the sum of $8,000. On the 15th day of September the following sums remaining due on the contract were paid:

| | |
|---|---:|
| Final Draw . . . . . | $ 4,500.00 |
| Extras . . . . . . | 1,468.85 |
| TOTAL . . | $ 5,968.85 |

This was "paid" by Copper Hills to Paramount in the following manner:

Interest on the loan in the sum of $24.75 was paid by a check to Wurts and by Wurts deposited in his personal account.

$5,000 was retained by Copper Hills and a bookkeeping entry was made offsetting advances on loans which Copper Hills had made to Wurts.

$944.10 was paid to Paramount and retained by Paramount. Spurr had agreed to this method of payment. Wurts renewed the note in December and at a later date paid it in full.

Standard had no knowledge of the arrangements between Wurts and Spurr whereby Copper Hills received credit for in excess of $8,000 on the contract obligation. Shortly after the "final payment" as above set forth, liens in excess of $26,000 were filed against the job. Standard claimed that Copper Hills still owed Paramount in excess of $8,000 which had not found its way into the Paramount bank account and declined to pay liens totaling this approximate sum. Standard paid all of the liens in excess of this sum. Copper Hills then paid the liens which Standard declined to pay and sued Standard for the sum so paid, recovering the judgment which is the subject of this appeal. Wurts testified that during the period of the building of the addition to the motel he had no knowledge that Paramount was delinquent in paying suppliers or materialmen. Spurr testified that prior to the 15th of September, to the best of his knowledge, Paramount was not in default in the paying of suppliers or materialmen in relation to this job; that at the time of final payment there was in excess of $26,000 of unpaid bills in relation to the particular job; that while he was not in default on the obligations in relation to the contract in question he was in default on other obligations; that Paramount ceased operation as a contractor around the 1st of October and in December filed bankruptcy with debts in excess of $200,000. Spurr hoped to be able to pay the $26,000 by securing additional capital which did not materialize. The trial court, among other findings, made the following specific findings:

"Neither Copper Hills nor its officers or employees, including Wurts, had received notice that Paramount was in default of its payments to laborers and materialmen prior to completion of the contract and the payment of the final amount due of September 15, 1960.

"There was no provision in the private contract bond of Standard Accident or in the contract between Copper Hills and Paramount which directly or indirectly prohibited the method of payment utilized by Copper Hills with the consent of Paramount."

No case directly in point has been called to our attention, nor have we found one. In the case of Webb Const. Co. v. Crane Co., 52 Ariz. 299, 80 P.2d 698 (1938), the Arizona Supreme Court recognized that sureties, even corporate sureties for hire, have rights. The evidence disclosed that Crane Co. knew the source of the monies which it received from the contractor or could reasonably have ascertained that source. The Supreme Court held that under the circumstances it was Crane's duty to apply the money received to the payment of the material that went into the job and (Page 317 of the Arizona Reports, page 707 of 80 P.2d)

"due to its default in this respect it has forfeited its right to enforce payment from Webb on his bond, that is, to the extent of the payments made. Nothing else would be equitable.

"It is utterly unthinkable that appellee, knowing that this money came from Webb, or having information that should have put it on notice of that fact, should be permitted to use it to pay somebody else's debt and then compel Webb by suit on his bond to pay it a second time."

We agree with the basic principles announced by the Supreme Court of Appeals of the State of Virginia in the 1932 case of American Surety Co. v. Plank & Whitsett, 159 Va. 1, 165 S.E. 660, reported in 165 S.E. at page 663, and we quote at length with approval from that decision.

" * * * Both parties knew that in the construction of the building it would be necessary for the contractor to incur obligations to the men who performed the work and those who furnished the materials. For the successful performance of these undertakings the owners were unwilling to accept the responsibility of the contractor alone. The American Surety Company, in consideration of payment to it of a premium of $690, undertook to be responsible for the faithful performance of the obligation of the contractor, both to the owners and to the workmen and materialmen."

\* \* \* \* \* \*

"Before the owners are entitled to recover for any loss which they have incurred by reason of the default of the contractor, they must show that they have performed the conditions under which the surety has promised to recompense them for loss suffered. These conditions are payments to the contractor in accordance with the terms of the contract."

\* \* \* \* \* \*

"The owners knew, or were charged with knowledge, that by the provisions of the bond which they had required the surety to give, the surety was responsible to workmen and materialmen in the event the contractor failed to pay their claims, and it was the duty of the owners to deal fairly, frankly, and in good faith with the surety. This they failed to do. * *"

"While the owners, as pointed out above, were under no legal duty to supervise the disbursement by the contractor of the 85 per cent which became due as the building progressed, the promise to pay these sums was an inducement upon which the surety relied in assuming the obligations named in the bond. When the surety is required to make reimbursements for a loss occasioned by the default of the principal, it has a right to require the owners to show how and in what manner they have performed their part of the contract. The owners, as between them and the surety, would have no right to pay the contractor under the terms of the contract by giving him credit for a debt owing them at the time the bond was executed unless the surety before assuming the risk was informed of this intention, or agreement, between the owners and the contractor. The obligee in the bond is not only required to exercise good faith with the surety at the time the obligations are assumed, but this good faith must be kept inviolate in all subsequent transactions affecting their rights and obligations created by the contract and bond. 21 R.C.L. 989. * * *"

Copper Hills urges that we do not know that Paramount would have used the $8,000 to pay claims arising out of the job and that, therefore, the surety was not injured by the arrangement between Wurts and Spurr. The surety guaranteed that after Paramount received the money that Paramount would disburse the money for the benefit of the Copper Hills job. Copper Hills and Paramount, through their respective officers, chose to deviate from the clear language of the contract in relation to the manner of payment. While the language of the contract may not have prevented the method of payment

which was used in relation to the obligations existing between Copper Hills and Paramount, this deviation was not binding upon the surety under the circumstances of this case.

This cause is reversed with directions to enter judgment in favor of Standard Accident Insurance Co., a corporation, denying recovery to Copper Hills Motor Hotels, Inc., a corporation, with costs taxed in favor of Standard Accident Insurance Co. in this Court and the Superior Court.

CAMERON and DONOFRIO, JJ., concur.