# Southwood Builders, Inc.

## v.

# Peerless Insurance Company

Record No. 841404

March 4, 1988

Present: All the Justices

*James J. Tansey* for appellant.
*Benjamin J. Trichilo (Lewis & Trichilo*, on brief), for appellee.

THOMAS, J., delivered the opinion of the Court.

There are two main issues in this appeal from a judgment in which a surety was held to have been released from all obligations under a performance bond and held not liable under a payment bond. The first issue is whether the trial court erred in holding that a modification of the principal contract released Peerless Insurance Company (Peerless) as surety of that contract under Peerless' performance bond. The second issue is whether the trial court erred in holding that Southwood Builders, Inc. (Southwood), was not a proper claimant under the payment bond and that, even if it was a proper claimant, the claim was barred by the statute of

limitations. In our opinion, there is no error in the judgment appealed from; therefore, we will affirm the trial court's judgment.

In October 1980, Southwood entered into a general contract with the Board of Supervisors of Gloucester County for the construction of the Gloucester County Courts & Office Building. On October 14, 1980, Southwood and United Drywall & Plastering Co., Inc. (United), executed a subcontract for United to furnish drywall and metal stud partitions. The subcontract set forth the contract price, work requirements, and bonding requirements.

In the contract, United agreed to "furnish all labor, materials, and equipment to perform all work necessary to complete" its subcontract. Under the section setting forth "Responsibility" these provisions are found: "(C) *All work shall be done under the direction of the Architect* and his decisions as to the true construction . . . shall be final," and "(e) Subcontractor shall at all times supply adequate tools, appliances and equipment, a sufficient number of properly skilled workmen and a sufficient amount of materials and supplies of proper quality to efficiently and promptly prosecute said work . . . ." (Emphasis added.) Under the section concerning "Time" this provision is found: "(a) Subcontractor shall begin work as soon as instructed by Contractor, and shall carry on said work promptly, efficiently, and at a speed that will not cause delay in the progress of Contractor's work . . . ." The subcontract also required United to provide "100% Performance and 100% Payment Bond" payable to the contractor in the sum of $79,500. Further, Southwood agreed to pay United $79,500, "*payable as the work progresses, based upon estimates of the Architect* and payable by Owner to Contractor." (Emphasis added.)

As required by the subcontract, United posted a performance bond and a payment bond. Both bonds were executed November 17, 1980. Both made specific reference to the October 14, 1980 subcontract and by reference made the subcontract part of the bonds themselves. Both were in the amount of $79,500.

United began work under the subcontract in May 1981. By late September or early October 1981, officials at Southwood became concerned that United would not be able to complete its work on schedule. Southwood's president, Frank T. Evans, approached United and asked United to put another crew on the job to insure timely completion. United responded that it could not do so because its financial resources were already strained to the maxi-

mum. Evans testified that, at the time he approached United about adding another crew, Southwood would have been justified in terminating United's subcontract on the ground that work was behind schedule.

However, instead of terminating United, notifying Peerless, and taking over the work, Evans proposed a deal to United: If United would add another crew, Southwood would pay for that crew and for all additional materials ordered by United for the job. This arrangement was made known neither to Peerless nor to the architects. The plan was that the monies paid by Southwood on United's behalf would be deducted from United's progress payments.

At the end of October 1981, the first month of the arrangement, the architects' certificates showed that United's portion of the job was only 60% complete. A month later, United made claim for progress payments contending that the job was 87% complete. However, the architects rejected that claim, concluding that no progress had been made on the job from October to November 1981. Consequently, the architects reduced the percent completed figure back to the October level of 60%.

At the end of October, United owed Southwood $6,814.35 as a result of their arrangement. Despite this outstanding debt, Southwood made a further payment to United of $4,390. These two debts totaled approximately $11,200.

On December 4, 1981, United advised Southwood that United could not complete the job. At that time, as indicated above, United owed Southwood a little more than $11,000. On that date, Southwood notified Peerless by telephone of United's default. This telephone notice to Peerless was confirmed by a letter dated December 7, 1981.

Southwood advised Peerless that it would cost between $6,000 and $10,000 in labor costs to complete the job because all the necessary materials were already on site. As it turned out, however, the materials which Southwood had been told by United were on site were not there. Southwood paid $20,000 for additional materials in order to finish the job.

Southwood initially submitted a claim to Peerless for $35,840.05 for the labor and material costs, in excess of the $79,000 contract price, that were incurred in completing the job. When Peerless refused to pay, Southwood sued for $57,080, an amount which included the cost of labor and materials to com-

plete the projects along with supervisory costs, profit, overhead, and interest. Peerless answered Southwood's suit and filed a motion for declaratory judgment in which it contended that the claims submitted by Southwood were not covered by the bonds. Peerless also filed a plea in bar, in which it contended that any claim by Southwood was barred by the statute of limitations.

The separate matters were tried together to the trial court sitting without a jury. The court rejected Southwood's claim under the labor and materials payment bond on the ground that Southwood was not a proper claimant under that bond and on the additional ground that, even if Southwood were a proper claimant, the claim was barred by the statute of limitations. With regard to Southwood's claim under the performance bond, the trial court concluded that Southwood could not recover because there had been material variations in the subcontract which prejudiced the rights of Peerless, resulting in Peerless' discharge.

## I

■ Although the trial court's rulings are embodied in a written order, Southwood focuses upon certain language used by the trial court from the bench in explaining its rulings. The trial court made the following statement:

> I find for Peerless in this case on a declaratory judgment on an issue of being discharged from the obligation because of *material variance* in the contract . . . . I feel that *we start with a very strict construction of the contract* to rule for Peerless in this case, that Peerless has contracted to act as a surety under a specific contract. Now, when the obligee takes it upon himself in any case to alter the terms of that Contract, if nothing more, the surety has lost its right to control events, to exercise options, to make elections.

(Emphasis added.) The trial court's remarks from the bench suggest that it was applying the rule *strictissimi juris* in deciding this case. However, that rule of strict construction, which requires discharge of the surety if *any* change is made in the original contract, does not apply in cases involving compensated sureties. In *Kirschbaum* v. *Blair*, 98 Va. 35, 40, 34 S.E. 895, 897 (1900) (quoting *Brandt on Suretyship & Guaranty* § 94 (1891)), we dis-

cussed the rationale for that rule of construction, making clear that it concerns accommodation sureties:

> "[A] Surety or guarantor usually derives no benefit from his contract . . . . He is bound by his agreement, and nothing else . . . . *Being bound by his agreement alone, and deriving no benefit from the transaction,* it is eminently just and proper that he should be a favorite of the law, and have a right to stand upon the strict terms of his obligation."

(Emphasis added.) In *C. S. Luck & Sons* v. *Boatwright*, 157 Va. 490, 494-95, 162 S.E. 53, 54 (1932), we said that compensated sureties do not deserve the special treatment accorded accommodation sureties:

> Sureties for hire are not wards of court to be shielded from heedlessness or folly. They must abide by their contracts and pay everything which by fair intendment can be charged against them. They act, not to accommodate others, but to promote their own interests, and are to be judged accordingly.

Thus, if upon examination it appears that the trial court's decision cannot be sustained except by application of the rule of strict construction in favor of the surety, then it must be reversed.

Peerless argues, however, that the trial court's decision was properly based upon the existence of a *material* variation in the principal contract and that the decision is supported by the evidence. Southwood responds that a material variation is insufficient, standing alone, to allow a compensated surety to be discharged. According to Southwood, there must exist *both a material variation in the principal contract as well as prejudice to the surety* before the surety can be discharged. Southwood explains its position by stating that even a material variation might be beneficial to the surety and, therefore, the issue of prejudice must be examined.

In this case, the conduct Peerless relies upon as the basis for its being discharged is in two main parts: (1) payments to United without approval by the architect, and (2) prepayments or advances such that United had early possession of contract funds. This Court considered a similar problem in *American Surety Company* v. *Plank & Whittsett, Inc.*, 159 Va. 1, 165 S.E. 660

(1932). Although the facts in that case differ somewhat from the instant appeal, we there examined the question of the impact of prepayments on a surety's obligations. In *Plank & Whittsett*, before the contractor started work, the owner lent the contractor $35,000 to be repaid in $4,000 installments taken from progress payments. The surety was unaware of this arrangement. Among other things, the principal contract called for payments to the contractor for work done "as estimated by the architect."

■ In holding that the surety was discharged from its obligations on the bond in question, this Court said that before an owner can recover under a bond, he must show that he has performed the conditions set forth in the bond.

> These conditions are payments to the contractor in accordance with the terms of the contract. Payments of substantial sums before they are due, or failure to retain the required percentage, are *generally held to be such variations in the terms of the contract as will discharge the surety from its obligations to the owner.*

*Id.* at 10, 165 S.E. at 663 (emphasis added).*

■ In our opinion, *Plank & Whittsett* puts to rest Southwood's contention that in a case of this kind courts in Virginia are required to look beyond the question of a material variation in order to decide whether a surety should be discharged. A separate showing of prejudice to the surety is unnecessary because a material deviation, in itself, establishes sufficient prejudice. See Stearns § 6.3. In this case, the material deviation is established by proof that the subcontractor was paid money before it was due and without approval by the architects. Such a procedure diminishes funds that should have been available to the surety in case of default, eliminates the architects' assurance that payments to the contractor are being used for the job, and undermines the induce-

---

* See A. Stearns, *The Law of Suretyship* § 6.8 (5th ed. 1951), where it is stated that the payment provisions of a building contract including such items as payment based on progress of work, and payment in accordance with architect certificates are generally considered "to be covenants for the benefit of the surety and, if the owner pays the contractor more than he is obligated to pay him, the contract is deemed to be materially altered and the surety released." See also, *Restatement of the Law of Security* § 128 comment f (1941) for the proposition that a surety should not be held to his obligation if the creditor and principal have so modified the contract as to impose a risk of loss substantially different from the one covered by the obligation.

ment to the contractor to finish the work on schedule in order to be paid.

The facts adduced in the trial court support the finding of material variation. The total subcontract price was $79,500. Contrary to the express language of the subcontract, the architects were completely excluded from the process for approving payments. United, instead of putting labor and materials into the job and then being paid, was able to secure payment solely on the basis of "claims" for labor and materials even though there was no assurance from an independent source that the labor and material had been put into the job.

The proof of the danger of the deviation agreed to by Southwood is in the result: United was to repay Southwood by deductions from United's progress payments. But there was very little progress, if any, and United wound up indebted to Southwood for more than $11,000. Further, United was to use all materials purchased by Southwood in the project. Yet, when United went into default, Southwood, which had been purchasing materials, and which had been told by United that all materials necessary to the job were on site, found that it had to purchase $20,000 in additional materials to complete the project. The combined total of the amounts overpaid to United and the material that had to be replaced is in excess of $31,000. This figure must be compared to an original contract price of $79,500.

■ The monetary impact of Southwood's deal with United was substantial. In the language of *Plank & Whittsett*, Southwood made substantial payments to United before they were due. Under these circumstances, we hold that the trial court did not err in discharging Peerless from its obligations under the performance bond.

## II

We turn now to the issue concerning Peerless' liability under the labor and materials payment bond. United stopped work on December 4, 1981. Southwood's suit under the payment bond was filed on March 10, 1983. The payment bond contained this provision: "No suit or action shall be commenced hereunder by a claimant, (a) after the expiration of one (1) year following the date on which Principal ceased work on said subcontract . . . ." United was the principal. Under the language of the bond itself, Southwood's suit against Peerless was plainly time-barred.

However, Southwood ignores the language of the bond and points to Code § 11-23 (repealed by Acts 1982, c. 647) in making an argument that its suit was timely. At the time of the events in this action, that code provision read in pertinent part as follows:

> No action on any bond required of a contractor under sub-paragraph (b) hereof or required of a subcontractor shall be brought unless within one year after the day on which the person bringing such action last performed labor or last furnished or supplied materials.

Under Southwood's reasoning, because it took over the job and furnished labor and materials through March 26, 1982, its suit was timely. By Southwood's approach, the date the principal under the bond stopped work has no bearing whatever on the statute of limitations question in cases where work on the defaulted project is continued by others.

Southwood's approach is without merit. First, the statute and the bond are to be read together. *See Thomas Somerville Co.* v. *Broyhill*, 200 Va. 358, 105 S.E.2d 824 (1958). The more restrictive language of the bond does not conflict with the statute and thus should be given full effect.

Second, Peerless gave a bond based on United's participation in the project. Once United defaulted, that bond could not, without Peerless' consent, simply be read to include the entity which took over United's work.

Third, the payment bond was designed to protect a claimant as defined in the bond, which included only those having "a direct contract with the Principal for labor, material, or both, used or reasonably required for use in the performance of the contract." Southwood had no such relationship with United. Southwood was United's general contractor. Southwood did not supply labor or materials to United. In essence, Southwood lent money to United which United used to pay for labor and materials.

We hold that the trial court did not err in concluding that Southwood's claim under the labor and material payments bond was barred by the applicable statute of limitations.

## III

For all the foregoing reasons, the judgment of the trial court will be affirmed.

*Affirmed.*