**Dorothy F. HEWITT and Abram S. Hewitt, Plaintiffs,**

v.

**Charles G. HUTTER and Luigi Gentile, Defendants.**

**Civ. A. No. 74–35(H).**

United States District Court, W. D. Virginia, Harrisonburg Division.

April 13, 1977.

J. Sloan Kuykendall, Kuykendall, Whiting & Costello, Winchester, Va., and Gilbert McKown, Berryville, Va., for plaintiffs.

James E. Farnham, Hunton, Williams, Gay & Gibson, Richmond, Va., for defendants.

OPINION and JUDGMENT

DALTON, District Judge.

This is an action for specific performance of a contract for the sale of Virginia real estate which is presently before this court for rendition of findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. In accordance with the provisions of this rule, the court enters the following findings:

(1) By a written opinion and order dated November 17, 1975, this court held that the defendants, Drs. Charles G. Hutter and Luigi Gentile, through their agent, Charles Tijerina, had entered into a valid and binding contract to purchase "Long Branch", a farm owned by the plaintiffs. *Hewitt v. Hutter,* 406 F.Supp. 976 (W.D.Va.1975). Thereafter, the defendants were granted leave to file an amended answer wherein they averred that Dorothy F. Hewitt, the plaintiff, committed independent acts of fraud by misrepresenting the profitability of the farming operation. In a Supplemental Pre-Trial Order dated July 28, 1976, the court defined the remaining issue in the case as "whether Mrs. Hewitt defrauded the defendants by making material misrepresentations with regard to the earnings, the profitability and/or the general financial status of the farming operation at Long Branch." (Supplemental Pre-Trial Order, Par. 2, Pp. 1–2) In the event that the court should resolve the fraud issue against the defendants, then the court must also decide whether the plaintiffs are entitled to recover interest on the purchase price, which

plaintiffs contend is payable from April 30, 1974, the alleged date on which the parties agreed to close the transaction.

(2) On August 12, 1976, *ore tenus* testimony was taken from the plaintiff, Dorothy F. Hewitt, and the defendants, Charles G. Hutter and Luigi Gentile. In addition to such testimony, the defendants offered into evidence several affidavits and depositions relating to matters not covered at the *ore tenus* hearing, including the deposition of Charles J. Tijerina taken in the case of *Luigi Gentile v. Tijerina,* now pending in a court in the state of California. The defendants rely heavily on the Tijerina-California deposition to support their allegations that Mrs. Hewitt perpetrated a fraud by misrepresenting to Tijerina the profitability of the farming operations at Long Branch. They specifically allege that in January, 1974, Mrs. Hewitt showed Tijerina figures relating to farm production that indicated a net profit of $90,000 for the calendar year 1973 and $70,000 for 1972, when in fact the property sustained operating losses for those two years in question. (Tijerina-California Deposition, Pp. 165–168) The plaintiff has strenuously objected to the introduction of the California deposition on the grounds that the Hewitts were not parties to that action and counsel for the plaintiff was not given notice of the taking of the deposition, nor was counsel present at the taking of the deposition.

(3) At the *ore tenus* hearing on August 12, 1976, Mrs. Hewitt was called to testify as an adverse witness by counsel for the defendants and she flatly denied that she had made any numerical representations to Tijerina concerning the yearly profitability of the farm. She recalled her conversation with Tijerina in early 1974 as follows:

A . . . He did ask me if I farmed it, and he asked me how the cattle business was, and I said well it had been very good in 1973, which it had been, and I said, "I figure if I am buying them at that price and selling them at that, I must be making money, but I don't know." And he never asked me anything whatsoever about the production, and if

he had, I couldn't have told him. I could have gotten it from the accountant, but I couldn't have told him, because I didn't know.

Q So your testimony would be then that if Mr. Tijerina subsequently represented to the doctors or to accountants in California that your farm in 1973 made a net profit of $90,000, either one, he had information that you didn't have, or two, he made it up. Is that right?

A That's right.

Mr. Farnham, if my farm had produced anything like that, it would not have been for sale, and if it had been for sale, people would have been lined up out to Route 50 with cash in their hands to buy it.

Q So you have no idea where that figure came from?

A No, I didn't know. I am absolutely incapable of fabricating those things. There are no books or anything that I have that could possibly substantiate those figures. The fact was that the farm, we never ran it to make money on the farm. We never attempted to make money on it. Every time that we thought that we going to have a little something, we put it back into the farm.

Q Was it essentially a tax shelter?

A Yes. Now in 1973, I had fifty acres that I put into soy beans, and the normal yield for soy beans in my part of the world is forty bushels to the acre, so that would be two thousand bushels of soy beans. Soy beans in 1973 were selling for $12 a bushel. So that is $24,000 extra I could have made in 1973. Do you know what I did with those soy beans? I plowed them in to make green manure to enrich the earth. (Tr. 18–19, August 12, 1976)

(4) As stated above, Mrs. Hewitt not only denied that she had shown Mr. Tijerina figures that indicated a net profit, respectively, of $70,000 and $90,000 in 1972 and 1973, she stated that she had no knowledge of any books that could possibly substantiate those figures. The only document she ever admitted having shown to Tijerina was

a ledger sheet containing statistics on the cost and sale of cattle. (Defendant's Exh. # 5, August 12, 1976) In connection with the statements therein, Mrs. Hewitt testified that she simply told Tijerina that, "If I am buying them at this price and selling them at that, then I must be making money, but I don't know. That is all I said to him." (Tr. 26, August 12, 1976).

(5) While Mrs. Hewitt was subjected to lengthy and vigorous cross-examination by counsel for the defendants, she consistently denied the accusations of fraud and her version of events remained virtually intact. Unlike Mrs. Hewitt, however, Mr. Tijerina has been deposed on two occasions and has rendered conflicting accounts of his meetings with the plaintiff. On October 27, 1974, Mr. Tijerina gave a deposition in connection with the present litigation wherein he stated that during negotiations with Mrs. Hewitt, he had an opportunity to review some charts on cattle and crops, but that Mrs. Hewitt couldn't determine what the net profit was going to be on her farm. (Tijerina Deposition October 27, 1974) That testimony is set forth below as follows:

Q Mr. Tijerina, did Drs. Hutter and Gentile ever request that you obtain copies of the books of the Long Branch for them?

A They asked me if I had looked at the books of the Long Branch farm and I told them that I had gone through the previous year's. Not the books *per se*, but her charts of cattle and crops and so on. And, what was the gross profits she made. Because she couldn't determine— due to the fact that she still had siladge (sic) she didn't know what her net would be and so on and so forth. (Pp. 85–86, Tijerina Deposition, October 27, 1974).

(6) Although Tijerina stated in his October, 1974 deposition that he eventually saw copies of books of Long Branch, he did not make copies of the records for his principals, Drs. Hutter and Gentile, because "they were so simple and, . . . so little." (Pg. 86) While he made some notes for his own reference purposes, he was unable to produce them at the time his deposition was taken. (Pg. 87) When he testified at the October, 1974 hearing, he never once intimated that Mrs. Hewitt had made any specific representations concerning the value of the farming operations at Long Branch. Mr. Tijerina waited until June 1, 1976 to come forward and testify in his California deposition that Mrs. Hewitt had shown him any figures on net profits for the years in question. Unlike his previous deposition, however, his testimony in the California case was developed by Dr. Gentile's attorney without the benefit of cross-examination by plaintiff's counsel.

(7) The defendants argue that the testimony of Mr. Tijerina is accurate because he also expressed to two other witnesses besides the doctors that Mrs. Hewitt had, during negotiations for the sale of the farm, stated that the farm had resulted in an operating profit in the amounts previously mentioned in this opinion. (Harland Gaynor Deposition, pp. 17–18; Clarence Agress Deposition, Pg. 16) Much of this testimony is based on hearsay, however, and its accuracy is dependent upon the credibility of Mr. Tijerina. In order to prove a case of fraud, the defendants must rest almost exclusively on the testimony of Charles J. Tijerina.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

(8) Because this is a diversity action concerning a Virginia real estate contract, the court must apply Virginia law. *Sterling v. Blackwelder,* 302 F.Supp. 1125 (E.D.Va.1968) *affd.* 414 F.2d 1362 (4th Cir. 1969). The law of Virginia relating to the elements and proof of fraud has been clearly and forcefully stated in many cases. To secure avoidance and rescission of a contract, it is incumbent on the party asserting fraud to establish by clear, cogent and convincing proof that he was induced to enter into a contract as a result of a misrepresentation or concealment of a material fact, and that, but for such misrepresentation, the defrauded party would not otherwise have agreed to enter into the transaction.

*Masche v. Nichols,* 188 Va. 857, 51 S.E.2d 144 (1949), *Porter v. Frost,* 183 Va. 549, 32 S.E.2d 687 (1945). After reviewing the evidence material to the fraud issue herein, the court concludes that the defendants have failed to prove by clear and convincing evidence that Dorothy Hewitt misrepresented to defendants that the farm resulted in net profits of $70,000 and $90,000 during the years 1972 and 1973, respectively. As stated previously, the defendants principally rely on the California deposition testimony of Charles Tijerina to support their allegations that Mrs. Hewitt misrepresented the value of the farming operations. This testimony, however, is inadmissible under the Federal Rules of Evidence because the plaintiffs were not given notice of such deposition nor were they provided with an opportunity to cross-examine Mr. Tijerina. Rule 804(b)(1) provides that the following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

> Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

(9) Under the rule set forth above, either the party against whom the testimony is offered or a predecessor in interest must have had the opportunity and *similar motive* to develop the testimony by direct or cross-examination. In the California deposition, however, Mr. Tijerina was not questioned on the fraud issue by plaintiff or a predecessor in interest but was interrogated by the attorney representing Dr. Gentile, who is an adverse party to the plaintiff in the present litigation. Thus, the court can hardly conceive of a situation where the motive to develop the testimony would be more dissimilar to the interests of the plaintiff herein.

(10) It must also be emphasized that Rule 32 of the Federal Rules of Civil Procedure impliedly prohibits the use of a deposition against any party who was not present or represented at the taking of such deposition or who had no reasonable notice thereof. The rule is based on an elementary principle of justice towards the party against whom the deposition is offered. While it has been repeatedly held that the presence of an adversary with the same motive to cross-examine the deponent, coupled with a substantial identity of issues, may suffice to permit the usage of a prior deposition in a subsequent action, *Whitten v. State University Construction Fund,* 359 F.Supp. 1037, 1039 (D.Mass.1973), it is clear that these elements are not present in the case now pending before this court.

(11) Even if the deposition is admissible, the court must question the credibility of Mr. Tijerina because of the apparent inconsistency between his statements in the California deposition and the deposition taken in connection with the proceedings herein. In the California deposition in June, 1976, Tijerina testified to several alleged misrepresentations by Mrs. Hewitt concerning the yearly net profits of the farming operations. When deposed on October 27, 1974, however, Tijerina stated that Mrs. Hewitt had not yet prepared figures on net profits. The fact that Mr. Tijerina waited until nearly two years later to come forward with detailed allegations of fraud impinges on his credibility as a witness. Furthermore, although Tijerina later stated that he viewed charts containing figures on net profits and that he made notes therefrom, the defendants have not submitted such written evidence to corroborate his testimony. The court is unable to determine, from the numerous financial exhibits in the record, the source of Tijerina's alleged information that the farm made a net profit of $70,000 and $90,000 in the years 1972 and 1973, respectively.

(12) The defendant's theory that the contract should be rescinded for fraud falls far short of clear and convincing proof when one considers the testimony of Mrs. Hewitt at the *ore tenus* hearing. Unlike Mr. Tijeri-

na, Mrs. Hewitt remained firm and consistent in her denial that she ever led Charles Tijerina to believe that the farm made a profit of $70,000 and $90,000 during the years in question. She testified that she had no knowledge of any books that could substantiate such figures. Mrs. Hewitt simply stated that, in showing a cattle chart to Mr. Tijerina, she indicated that if he was buying and selling at these prices, then she must be making money. Mrs. Hewitt added, however, that she wasn't sure whether the farming operations would result in a profit and that she conveyed this fact to Mr. Tijerina.

(13) Because of the conflict between the testimony of Mrs. Hewitt and Mr. Tijerina, the question of whether the plaintiff perpetrated a fraud on the defendants ultimately depends on the credibility of each witness. After reviewing all of the evidence, the court finds that Mrs. Hewitt's testimony was consistent throughout vigorous cross-examination and should be given greater weight than the testimony of Charles Tijerina in the California deposition. Accordingly, the court holds that the defendants have failed to prove fraud by clear, cogent and convincing evidence.

(14) Now that the court has determined that the parties entered into a valid, enforceable contract for the sale of real property, the court must turn to the question of whether the plaintiffs should be awarded interest on the purchase price from April 30, 1974. Under Virginia law, the statutory provisions governing interest awards provide that:

> . . . In any suit in equity, or in an action or motion founded on contract, when no jury is impaneled, decree or judgment may be rendered for interest on the principal sum recovered, until such decree or judgment be paid . . . § 8–223, Code of Va.

■ (15) The language of this section is permissive, however, and the ultimate question of whether to allow interest is left to the sound discretion of the trial court. *Doyle & Russell, Inc. v. Welch Pile Driving Corp.*, 213 Va. 698, 194 S.E.2d 719 (1973).

In this connection, the court is particularly mindful of the judicial admonition that awards of prejudgment interest are sometimes inappropriate in cases involving a bona fide dispute on the merits. *Inland Drilling Company v. Davis Oil Company*, 183 Neb. 116, 158 N.W.2d 536 (1968), 181 Neb. 609, 150 N.W.2d 108 (1967), *Textile Workers Union v. Brookside Mills, Inc.*, 205 Tenn. 394, 326 S.W.2d 671 (1959).

■ (16) In the present litigation, the court was required to resolve some difficult issues regarding the validity of a contract for the sale of a large parcel of real estate. While the court finds that the plaintiffs must prevail on the questions of whether the parties entered into a valid contract, it should be noted that the arguments advanced by the defendants were not entirely without merit. This action involved a protracted dispute over a contract involving a large sum of money. The court does not feel that it would be fair to penalize the defendants for exercising their right to litigate any bona fide legal questions that arose in connection with the formation of this contract by imposing on them an obligation to pay a large sum of prejudgment interest. Thus, the court must decline to award interest to the plaintiff.

(17) This position is further supported by the fact that the plaintiff has been in possession of the valuable farm Long Branch since the contract was made. The court feels that the reasonable rents and profits and possession of such a desirable cattle farm and mansion house should equate with reasonable interest from the date of April 30, 1974, and the court so finds.

Accordingly, it is hereby ADJUDGED, ORDERED and DECREED that:

1) specific performance of the contract for the sale of real estate known as Long Branch be granted, and accordingly that judgment be and hereby is entered in favor of the plaintiff.

2) that plaintiffs within 30 days execute and proffer for delivery a deed conveying the property to defendants, upon which delivery of the deed the defendants shall pay

the purchase price. Failing to pay the amount of the contract of purchase, the court directs that execution be issued 15 days after proffer of deed for the amount due, and the court will take such further action and enter such further orders as may be requisite. Each party shall bear their own costs.