**Dorothy F. HEWITT and Abram S. Hewitt, Appellees,**

v.

**Charles G. HUTTER and Luigi Gentile, Appellants.**

**Nos. 77–1902, 77–1903.**

United States Court of Appeals, Fourth Circuit.

Argued Dec. 8, 1977.

Decided Jan. 27, 1978.

James E. Farnham, Richmond, Va. (Hunton & Williams, Richmond, Va., on brief) for appellants in 77–1902 and for appellees in 77–1903.

J. Sloan Kuykendall, Winchester, Va. (George W. Johnston, III, Kuykendall, Whiting, Costello & Hanes, Winchester, Va., on brief), for appellees in 77–1902 and for appellants in 77–1903.

Before BRYAN, Senior Circuit Judge, and BUTZNER and RUSSELL, Circuit Judges.

ALBERT V. BRYAN, Senior Circuit Judge:

Specific performance of a contract for the sale and purchase of a farm, with its improvements and accessories, located in Virginia, was decreed by the District Court at the suit of the record owner, Dorothy Hewitt, with her husband, Abram S. Hewitt, against Charles G. Hutter and Luigi Gentile, who now appeal.[1] Particularly, they contend that no such agreement was made by them, that on their part there was nothing more than an offer by the owner to sell to them, and that even as alleged, the contract was oral and so unenforceable under the statute of frauds, Va.Code, 1950, as amended, § 11–2.[2]

The points of difference between the parties are the inferences to be drawn from the facts, and the legal effect to be given them as they were found by the District Judge and now follow. Before the inception of the instant controversy one Charles Tijerina was the defendants' (doctors') advisor on investments. On this subject they informed him of their interest in Virginia land. In furtherance they provided him with a December 1973 letter addressed "TO WHOM IT MAY CONCERN", conferring upon Tijerina absolute discretion to act for them. He took it with him to Clarke County, Virginia, with the acquisition of real estate in mind. After talking with brokers Thomas & Talbot in nearby Middleburg early in January, he learned that "Long Branch" farm was for sale. Inquiring about it, he met plaintiff Dorothy Hewitt on January 5 and disclosed and expressed his wish to purchase it.

After conversing with her again, he left for California and there outlined to the doctors the availability of the farm. Following this discussion they signed and gave Tijerina a letter dated January 25, 1974. It empowered him to offer $775,000.00 for Long Branch and to go to $850,000.00, if necessary. Included also was this injunction: "Enter into contract, and advise us as soon as you reach an agreement". Another letter from the doctors, January 28, 1974, directed him to select a lawyer. Further, before departing California, Tijerina also was entrusted with general and special powers of attorney, dated January 31, 1974, investing him with unbounded power and discretion in executing their mission.

Arriving in Virginia February 8, he advised the same brokers, whom he had initially met, of his preparedness to make an offer to buy Long Branch. They relayed it to Hewitt in a personal interview. On that occasion she was shown the evidences of his authority, particularly, to pay $850,000.00 for the farm. She declined it, insisting upon $950,000.00.

On report of this result to his principals, they directed Tijerina by telephone to offer $950,000.00, confirming it by letter of February 15, 1974.

Through the brokers, a meeting was scheduled for Hewitt and Tijerina at the Red Fox Inn in Middleburg. They met there on February 20, and Tijerina submitted to her again his powers of attorney,

---

1. Jurisdiction was laid and indisputably proved on diversity of citizenship. The complainants were citizens and residents of Virginia and the respondents citizens and residents of California. As all the negotiations and incidents of the pleaded contract occurred in Virginia, the law of that State concededly governs in this controversy. *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

2. As pertinent this statute reads:

§ 11–2 When written evidence required to maintain action.—No action shall be brought in any of the following cases:
  (6) Upon any contract for the sale of real estate . . .
  . . . Unless the promise, contract, agreement . . . ratification, or some memorandum or note thereof, be in writing and signed by the party to be charged thereby, or his agent; . . . . .

the letter directing him to "Enter into contract", as well as the letter of February 15 raising their proposition to $950,000.00. The meeting occupied some two hours, a portion of which was devoted to consideration of the farm equipment in use at Long Branch.

At that meeting Hewitt and Tijerina agreed upon the sale to the doctors of Long Branch and specified personal property for $950,000.00. Immediately Hewitt went to her brokers, Thomas & Talbot, and acquainted them with the consummation of the sale of the farm and personalty. Tijerina also then apprised the brokers of his earlier arrangement for the preparation of a contract by Thomas G. Underwood, a lawyer, to whom he had narrated the negotiations with Hewitt and their conclusion. Likewise, Hewitt retained legal counsel. Desiring to know more about the farming of Long Branch and the accompanying utensils, he procured this data by telephone the next day.

In consultations, the lawyers produced a final document and upon submission of it to Hewitt and her husband by their attorney, they signed it on March 1, 1974. Thereupon one of her brokers obtained the document at the lawyer's office.

This same day, March 1, 1974, Tijerina himself wrote out a letter addressed to the brokers stating as follows:

"After so many tries to put the contract in a form that is mutually agreeable to all, we have finally accomplished today, a contract, that has all the requisites that I required. I am happy that this is all over with.

\* \* \* \* \* \*

"I realize that having them [the sellers] sign first is unusual, but it is my desire that my principles [sic] sign for themselves as a courtesy to them and I hope that the sellers would consent to this further request. . . .

"Since I approve the contract as to form, terms and conditions, on behalf of my principles, [sic] by virtue of the authority vested in me, it is acceptable to me and I am sure all concerned are pleased and you may inform Mr. and Mrs. Hewitt that we have a deal, and that the loan commitment has verbally been approved. . . ."

Tijerina had this letter typed in the brokers' office, signed it and left it with them. Afterwards he carried the contract instruments to his principals in California.

Pending their endeavors to acquire Long Branch the doctors on January 25, 1974 had executed an application to the Metropolitan Life Insurance Company for a loan of $500,-000.00. A Company letter of March 1, 1974 approved the loan. On March 11, a truth-in-lending statement was sent in by the doctors. Metropolitan wrote Tijerina's attorney, Thomas G. Underwood, in Virginia on April 18, 1974, with a copy of its letter of approval and listing the title requirements on Long Branch on which the loan was to be secured. With no answer from the attorney, Metropolitan wrote the doctors on May 24 that the loan commitment had expired on May 15 and would not be extended at the originally quoted rate of interest. The doctors did not respond.

The first word of the doctors' refusal to comply with the agreement came to Hewitt by a letter of April 29, 1974, signed by them and delivered by defendant Hutter to the brokers about that day. He gave as reasons for the declination "(1) that Tijerina wasn't authorized to go $950,000.00 and (2) that he felt it wasn't a working farm".

I

While we view this recital of facts to be findings of the District Judge and we accept them because we cannot say they are "clearly erroneous", F.R.Civ.P. 52(a), appellants insist that they do not have, and are not to be accorded, this stature. They reason that as defendants they moved for summary judgment; that it was denied, *Hewitt et al. v. Hutter et al.*, 406 F.Supp. 976 (November 17, 1975); that in the course of the opinion the trial judge found the facts as just recounted; that virtually this was the equivalent of a summary judgment for the plaintiffs by the Court; especially do

they point out that in a subsequent pretrial order, July 27, 1976, the District Judge observed, "By opinion and order of November 17, 1975 [denying defendants' motion for summary judgment] this Court, *sua sponte* entered summary judgment in favor of plaintiffs on the issue [of whether the parties had entered a legally binding contract]". Consequently, defendants conclude, the proof must be read in the light most favorable to them as defendants, and every issue of fact settled in their favor, and when so treated, their motion should have prevailed. *Cram v. Sun Insurance Office, Ltd.*, 375 F.2d 670, 674 (4th Cir. 1967).

■ Though plausible, nevertheless on study of the proceedings as a whole, this conclusion will not stand. To begin with, there was no "judgment" whatever in the order of November 17, 1975 awarding the plaintiffs any of the relief prayed in their complaint. It only overruled defendant doctors' motion for summary judgment. Indeed, the record disclosed no motion of that kind by the plaintiffs. Nor did the Court even intimate an intention to follow through with a judgment for the plaintiffs. The reason is quite apparent. The Court was fully cognizant that at that stage, the action was not ripe for a final determination. Despite the failure of their motion, the defendants were still entitled to a plenary hearing, not to be foreclosed by an immediate decree for the plaintiffs. The latter, too, enjoyed the same privilege.

At all events, as will appear in a moment, both parties took advantage of this opportunity, later producing further evidence on the identical issue of the factum of a contract as well as on the defendants' subsequent plea of fraud. The offer of such additional evidence and the admission of it by the Court, unequivocally and irretrievably manifest that neither the parties nor the Court treated the order as a summary judgment giving the plaintiffs the remedies they sought.

In a pretrial order of July 27, 1976, it appears that defendants had filed earlier, July 7, 1976, a motion for reconsideration of the order denying them summary judgment on November 17, 1975 and asked a hearing thereon. Exhibited with the motion were a deposition and affidavits, thus bringing additional defendant evidence into the case. Action on the request was deferred by the Court "to *review* defendants' motion and *attachments* and to advise the parties at the earliest practicable date". (Accent added.)

Hence, the District Judge's recitation in the pretrial order of the proceedings incident to the defendants' summary motion eight months before, November 17, 1975, as including a judgment by the Court for the plaintiffs *sua sponte*, was incorrect. Indeed, it was error so to recite it. This is true, too, of similar subsequent references to this interlocutory ruling. Not until April 11, 1977 did the Court enter its final "Opinion and Judgment". Therein it was recalled that "[b]y a written opinion and order dated November 17, 1975 this Court *held* that the defendants . . . had entered into a valid and binding contract to purchase Long Branch". (Accent added.) For the first time the Court entered a "judgment" (not simply an "order" as before) declaring that the parties had consummated a contract and granting plaintiffs specific performance with directions for its effectuation thereof. This decree of itself refutes defendants' contention that a *sua sponte* judgment had been passed summarily for the plaintiffs on November 17, 1975.

## II

■ Motions aside, primarily appellants' defense is one of *non est factum*.[3] In so defending, they maintain that the Red Fox Inn conversations between Dorothy Hewitt and Tijerina on February 20, 1974 did not culminate in an oral agreement to sell and buy, and went no further than an understanding of what terms *would be* embodied in a contract but that no such document was ever executed by them. This position, we hold, will not stand the light of fact and law.

---

**3.** The defense of fraud in the inducement was abandoned and is not in this appeal.

The facts depict, step-by-step, how Tijerina went into the meeting with Hewitt on February 20, 1974 with unlimited authorization, by word of mouth as well as in documents, to buy Long Branch, plus certain items of personal property, at the owner's figure. Both came out wholly satisfied that he had agreed to purchase, and she to sell, at her price. In that conference the terms of their accord were completely stated, defined and fixed as of February 20. They were not modified in any sense during the exchange of drafts, putting the agreement in writing, until the last memorial of it was signed by the Hewitts and approved by Tijerina's letter on March 1, 1974. That this agreement was achieved on February 20 was not only the testimony of Hewitt but was also avouched under oath by Tijerina in the depositions in Virginia. On this issue she was questioned and responded:

"Q. Now, as you understand these negotiations, at what point in time did there exist a binding legal contract between you and the defendants in this case?

"A. At the time that Mr. Tijerina and I sat down to negotiate the terms of the contract.

"Q. On February 20?

"A. On February 20th.

"Q. All right.

"A. That was when we made the contract.

"Q. This was when?

"A. That was when we came to the agreement as to the price and to the particulars which would constitute the contract.

"Q. So again now, for purposes of defining when in your mind there was a valid binding legal contract, it's your testimony that there was an offer and an acceptance on February 20, which constituted the contract that's in question in this litigation?

"A. Yes."

.   .   .   .   .

"Q. It was the offer contained in the doctors' letter [authorizing Tijerina to go to $950,000.00] then, which is the offer of February 15th, and is Exhibit Six?

"A. Yes.

"Q. Which you accepted on March 1?

"A. I accepted it on February 20; I've told you that again and again.

"Q. Did Mr. Tijerina ever advise you that he could not execute these contracts on behalf of his principals?

"A. No. On the contrary I saw the documentary evidence that he could do so."

Likewise Tijerina stated unqualifiedly as follows:

"Q. All right. Now, after you showed Mrs. Hewitt the letter of February 15th, what further discussions did you have with Mrs. Hewitt respecting the purchase of Long Branch on that visit?

"A. Well, we agreed on the price. We agreed on several other things that I was after that were at the farm. I tried to get the cattle, but she wouldn't go for it. I had made a list of things and she agreed to some and disagreed to others. So we came to a conclusion on, I would say, ninety percent of the things and the next day it was a definite no or a yes on a few other things.

"Q. Uh-huh. Now, when Mrs. Hewitt left on the day that you had that meeting with her at the Red Fox had you all reached an agreement at that time?

"A. Well, we had agreed to the price. When she left that afternoon we had agreed as to the price and to many of the assets of the farm such as the tractor and the Scout and all of the farm equipment and so on and so forth. And I wanted to know more in detail about her arrangements and so on and so forth that she had with the sharecropper. I wanted more information on that, which she gave me the next day."

So circumstantiated, there cannot be the least doubt that an *aggregatio mentium* occurred on February 20.

### III

Contrary to the appellants' concept, the Virginia statute of frauds does not out-

law or vitiate the agreement.[4] Its effect is only procedural, barring an action thereon unless evidenced by a writing signed by the party to be charged or his agent. *Burruss v. Hines*, 94 Va. 413, 419, 26 S.E. 875, 877 (1897); *see* the scholarly opinion of District Judge Michie in *Stein v. Pulaski Furniture Corporation*, 217 F.Supp. 587 (W.D.Va. 1963).

■ However, presently this is not a critical concern because there is a "writing", signed by the sellers and by the purchasers' agent. It is embodied in the letter of March 1, 1974 written by Tijerina to the brokers, from which we have already quoted (p. 185 *infra*) the vital portions. The efficacy of this document is beyond cavil. At the time of its execution by Tijerina, he was invested with an authority equivalent to the entire power possessed by his principals. To recall, he held from them a special power of attorney, a general power of attorney and a letter authorizing him to buy the property. Ample precedent warrants the statement that this letter fully satisfies the Virginia statute requiring a signed writing for the enforcement of an oral contract for the purchase of land. *Reynolds v. Dixon*, 187 Va. 101, 46 S.E.2d 6 (1948). Again, the agreement concluded on February 20, 1974 was not denuded of even a minim of its binding effect by the deferment until March 1 of the reduction of the agreement to a final memorial. *Browder v. Mitchell*, 187 Va. 781, 48 S.E.2d 221, 223 (1948).

### IV

■ Finally, appellant-purchasers contend that the sellers are barred of the contract they assert in view of its section 20, reading:

"It is understood and agreed that Seller has executed this contract in advance and it shall constitute an offer to sell until such time as it has been accepted by the Buyer by their execution hereof and returned to Seller along with a certified or cashier's check in the amount of Ninety-Five Thousand Dollars ($95,000.00) representing the deposit hereinbefore mentioned."

This agreement is conclusively refuted by Tijerina's letter of March 1, 1974 (p. 185 *infra*) which he wrote, signed and delivered to the brokers before returning to California with the written contract also dated March 1. Notably, he stated that this document "finally accomplished today, a contract, that has all the requisites that I required". More pointedly, his letter continues " . . . I approve the contract as to form, terms and conditions, on behalf of my principles [sic] by virtue of the authority vested in me, it is acceptable to me and I am sure all concerned are pleased and you may inform Mr. and Mrs. Hewitt that we have a deal".

Tijerina was unmistakably equipped with every conceivable authorization and without reservation or condition, to accomplish and consummate the purchase of Long Branch. It follows that within his comprehensive authority was the power to treat the agreement as perfected and ended without inclusion of the provisions of section 20. Tijerina's testimony and that of Hewitt disavowed its terms as ever intended by either of them to be a part of their agreement, saying it was put in the memorial afterwards by way of "lawyer talk".

■ On the appeal of the doctors we affirm the opinion and judgment of the District Court entered April 11, 1977; on the cross-appeal of the Hewitts, we also affirm the denial by the District Court of interest on the purchase price accruing before the judgment of April 11, 1977. For this latter ruling, we advert to the continued enjoyment by the sellers during the pendency of the suit in the trial court of the occupancy of the farm and benefit of its operations, believing that these advantages would offset the interest during the same period.

Affirmed.

---

4. See footnote 2 for the provision of the statute.