**CONTINENTAL INSURANCE CO. Plaintiff,**

v.

**The CITY OF VIRGINIA BEACH, Defendant.**

**Civ. A. No. 2:95cv212.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Nov. 29, 1995.

Timothy Gerard Clancy, Cumming, Hatchett, Moschel, Patrick & Clancy, Hampton, VA, Wendy Ann Hartmann, Robert F. Carney, Whiteford, Taylor & Preston L.L.P., Baltimore, MD, for Continental Insurance Company.

Charles Bernard Miller, Assistant City Attorneys, Richard Jay Beaver, Office of City Attorney, Virginia Beach, VA, for City of Virginia Beach.

### OPINION AND FINAL ORDER

CLARKE, District Judge.

Continental Insurance Company filed this action against the City of Virginia Beach alleging that its duty as surety under a performance bond was discharged when the City materially deviated from the contract between the City and the construction contractor. A bench trial was held on October 18–19, 1995. Instead of presenting closing arguments, both parties agreed to submit written post-trial memorandums. Based on the evidence presented and the parties' memorandums, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. For the reasons set forth below, judgment is **GRANTED** for the Plaintiff for $252,720.68 (the $234,827.63 stipulated to by the parties plus consulting fees minus the amount Plaintiff agreed it owed Defendant at trial). The Court DENIES all other claims, including the prejudgment interest requested by the Plaintiff, the liquidated damages sought by the Defendant, and the declaratory relief sought by the Plaintiff.

### I. FACTUAL AND PROCEDURAL HISTORY

On November 8, 1991, the Defendant, the City of Virginia Beach (City), contracted with Utility Builders, Inc. (Utility) for the construction of certain sewer and water lines in an area of Virginia Beach known as Lynnwood/Michaelwood. At this time, Plaintiff, Continental Insurance Co. (Continental), as the surety for the construction contract, executed a performance and payment bond in favor of the City for $1,336,863.00, the contract amount. Under the Original Contract, the construction project was to be completed by September 4, 1992.

Utility began the construction work in November of 1991. The contract provided for a monthly payment to the contractor during the course of the project. Each month, Utility submitted monthly requisitions for payment to the City. The City Inspector for the Lynnwood/Michaelwood project, Barry Turner, then determined the amount of work for which Utility should be paid. Mr. Turner did this by verifying the amount of work Utility submitted as having been installed. Mr. Turner approved payment on the basis of the number of feet of various types of sewer pipe that were installed or the number of man-

holes installed without regard to its having been inspected or tested.

The measurement for payment, which was signed by Mr. Turner and the contractor's representative, was then submitted as part of the Contractor's Estimate to Mr. Clyde March, one of the City's Construction Inspectors. Upon receiving the Contractor's Estimate, Mr. March would review it and send it and an Estimate Voucher to the Project Engineer. The Project Engineer would then determine if he had any "exceptions" to the estimate. If approved, Mr. March and the Project Engineer would then sign a Department of Public Utilities Contractor's Estimate and Invoice Transmittal, the form required under the Original Contract to be filled out in order for payments to be made.

In accordance with this procedure, Utility was paid for six monthly estimates between December 1991 and May 1992, totalling $1,031,462.00. On June 16, 1992, before paying Utility its seventh monthly estimate, the City learned that Utility had filed for bankruptcy. The City immediately declared Utility to be in default under the contract and withheld the seventh payment.

Prior to Utility's bankruptcy, the City had no reason to suspect that Utility would not complete the contract. During this time period, the City had not required and Utility had not submitted test reports for compaction of fill and backfill. In addition, very few tests of the work already in place had been performed by either the contractor or the City. As of June 15, 1992, no (0%) testing of the sewer force mains had been done, although 3,005 feet had been measured for payment. As for the gravity sewer lines, 65% of the deflection tests and 50% of the infiltration and exfiltration tests had been completed, but 0% of the mirror tests had been performed, even though the City had paid Utility 100% of the cost of 12,210 feet of sewer. The City also paid Utility for 58 "installed" manholes despite the fact that the inverts, drop connections, and interior finishes were not completed and the frame and covers were not at final surface grade. Moreover, the City paid Utility in full for

sewers before site restoration, grading, and driveway replacement had been performed.

After declaring Utility in default, the City demanded that Continental, as the performance bond surety, complete the Original Contract. Continental hired a consultant to prepare and issue a package of "rebid" documents soliciting bids for the completion of the contract. Precon Construction, Inc. (Precon) was the lowest responsible bidder, and thus was selected to finish the project. On October 28, 1992, the three parties—the City, Continental, and Precon—entered into a Tri–Party Agreement which set forth the terms of the Completion Contract. Besides detailing the components of the project that needed to be completed, the Tri–Party Agreement also provided a mechanism for correcting any of Utility's work found to be defective. If Precon found any defects beyond the work outlined in the contract, it would submit a defect repair request to Continental's consultant; once the repair was authorized, Precon would correct the problem.

While Precon was completing the project, numerous defects in Utility's work were discovered. Initially, Continental paid for most of these repairs, but when the amount of the repairs became substantial, Continental and the City agreed to divide the cost of the remainder of the repairs in order to expedite the completion of the project. Each party, however, reserved its right to sue the other for the amounts it paid for the repairs. Continental paid Precon $183,102.63 to repair the defects; the City paid $86,735.99. In addition, a certain number of line items in the Completion Contract were actually repairs of Utility's defective work and were paid by Continental at a cost of $51,725.50.

The bottom line, therefore, is that, at the time of the default, the City had already paid Utility $1,031,462.00 of the $1,336,863.00 total contract amount, despite the fact that very little of the testing and inspection had been completed. Because Utility had received most of the contract money already, the parties were then forced to spend an additional amount ($321,563.62), beyond the cost of completing the unfinished work under the contract, to correct problems discovered

when the City made the required inspections and tests.

After the project was concluded, Continental filed suit against the City to collect the $234,827.63 [1] the insurance company had paid Precon to correct or complete work performed by Utility that the City had measured for payment and had paid to Utility prior to inspecting the work. Continental also claimed prejudgment interest, consulting fees spent to repair the defects, and court costs.[2] Additionally, Continental asked the court to enter a declaratory judgment pronouncing that Continental has no more liability under the contract. Continental maintains that the City's 100% payments to Utility constituted a material variation from the contract thereby releasing Continental from its obligation as surety. If the City had performed the tests and inspections prior to paying Utility the full amount for each of the items installed, Continental asserts, the defects that gave rise to the exorbitant repair costs would have been discovered, some of the payments would have been withheld, and enough money would have been available to cover the cost of completing the contract.

The City, on the other hand, denies that its payment procedure constituted a material variation from the contract terms and has filed a counterclaim for the $86,735.99 it paid to Precon for the repairs. The City is also seeking to recover the liquidated damages provided for in the Original Contract due to the project's failure to be completed on time.[3] The City bases its claim on the theory that Continental was still liable as the performance bond surety and therefore was fully responsible for the completion costs.

## II. CONCLUSIONS OF LAW

Federal court jurisdiction exists in this matter. Continental is a New Hampshire corporation with its principal place of business in New York. The City of Virginia Beach is a municipal corporation located in the State of Virginia. Because diversity of citizenship exists and the amount in controversy exceeds $50,000.00, this Court has jurisdiction pursuant to 28 U.S.C. § 1332. The Court also has jurisdiction to issue declaratory relief under 28 U.S.C. § 2201. The substantive laws of Virginia apply to the contract and suretyship issues in this case. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

During the trial, the parties stipulated that if Plaintiff proved a material variation to the contract between the City and Utility, Plaintiff was entitled to $234,827.63,[4] and if Plaintiff did not prove a material variation, Defendant was entitled to $86,735.99.[5] Thus, the primary issue this Court must decide is whether the City's actions constituted a material variation from the Contract.

### A. The Terms of the Original Contract

The crux of the problem in this case lies in the contract language and in the procedures the City used in paying Utility. Continental claims that the contract required the City to inspect Utility's work before paying it 100% of the contract price for its "completed" work; the City claims that the contract does

---

1. This figure includes the $51,725.00 paid to Precon for the corrective repairs in the Completion Contract plus the $183,102.63 paid to Precon for the authorized repairs found while Precon was finishing the job.

2. In its complaint, Continental also claimed the reasonable value of adding an overlay to one of the streets. While Utility was still performing on the Original Contract, the City and Utility had orally agreed to this additional job, but Utility had not procured a written change order. The City has never increased the Original Contract funds to cover this additional work. At trial, Plaintiff conceded that it had not followed the proper procedures to alter the contract and dropped its claim.

3. The project was completed June 3, 1993. The original project had been contracted for completion on September 4, 1992. Because of Utility's default, therefore, the project was completed 274 days late. The Original Contract provided for liquidated damages at $350 per day, which would total $95,900.

4. Minus $5,679.97 for Count III of the City's Counterclaim, which was a claim for money expended by the City to maintain and preserve the construction site following Utility's default. During opening arguments, the Plaintiff agreed to pay these money damages.

5. Plus the $5,679.97 Plaintiff conceded it owed the City. *See supra* note 4.

not require it to inspect or test the contractor's work before paying out the full amount. Thus, the first step is an analysis of the express language of the contract.

The Original Contract has a number of provisions dealing with the payment and inspection procedures. The contract also contains a Specifications section which details the procedures and requirements for certain components of the project, such as force mains, manholes, and sewer lines. The interpretation of these provisions is crucial to the case.

### 1. Payment and measurement of work provisions

The General Requirements section of the contract contains the basic measurement and payment provision. Section 1.03 provides that the "measurement of the various pay items will be made by the owner [the City]." *See* Gen'l Reqmts. § 1.03, at p. 01000–2. The contract further provides that "[t]he measurement of all items is based upon their satisfactorily being installed and completed in accordance with the terms of the contract documents." *Id.* Thus, this section clearly provides that it is the City who decides how much is to be paid to the contractor, and that this determination is dependent upon the items being satisfactorily installed and in accordance with the contract terms.

The "contract terms" are more fully explained in the subsections of section 1.03 of the contract. Here, the specific elements which are included as part of the cost of each component of the project (i.e., the line item prices) are enumerated. For example, the description of the measurement for water mains states that "pipe in place will be paid for at the unit prices bid and shall include the cost of furnishing and installing the pipe, fittings …, the cost of excavation, temporary sheeting and bracing, … *testing and inspection* …" Gen'l Reqmts. § 1.03(D)(1), at p. 01000–6 (emphasis added). The description for the measurement of gravity sewers similarly provides that "pipe in place shall be paid for at the unit prices and shall include the cost of … testing and inspection …" *Id.* § 1.03(E)(1), at p. 01000–8. Under the express terms of the contract, therefore, the number of feet for which payment is claimed must have in fact been "satisfactorily installed" and "completed in accordance with the contract." The language "satisfactorily installed" and "completed in accordance with the contract" clearly includes testing and inspection as these requirements are all part of the measurement to fix the amount owed the contractor.[6] Moreover, the City Inspector admitted at trial that the only way to verify that items have been installed according to the contract specifications is to test them. Therefore, when the City paid Utility the full amount for an installed item, under the terms of the contract the City was implicitly indicating that the work being completely paid for had been tested and had been inspected and was deemed satisfactory.

The contract's payment procedures also support this interpretation of the contract's terms. *See* Gen'l Reqmts. § 1.03(G)(1)–(2), at p. 01000–12. The relevant section states that "[e]ach application for payment by the contractor shall be submitted on the forms provided by the Department of Public Utilities." *Id.* § 1.03(G)(1). The form itself states that "the work as indicated on attached estimate has been inspected and is deemed acceptable as per specifications. Quantities and type of materials are in accordance with the contract and any subsequent change orders." Directly below this language, the form provides a space for the signatures of the contractor and the City Construction Inspector (see the payment authorization procedure outlined above). This form is included in the bid documents and the contract specifications and consequently is part of the contract. This form, therefore, when signed by the City's representative,

---

6. Defendant has argued that because the language of the preamble paragraph only refers to the items being satisfactorily "installed and completed" and not to their being satisfactorily "tested and inspected," testing and inspection are not required. The Defendant fails to realize that "in accordance to the terms of the contract documents" clearly includes inspection and testing, and the term "satisfactorily" can also be read to encompass testing and inspection. Simple logic tells us that an inspection and testing is necessary to determine if the installation has been satisfactorily performed.

clearly indicates that the inspection and testing of the paid for items have been completed.[7]

Finally, the contract's other payment provisions also support this interpretation. Section G states that "[t]he owner shall pay to the contractor 100 percent of the total amount due." Gen'l Reqmts. § 1.03(G)(2), at p. 01000–12. The Defendant argues that the lack of a retainage clause in the contract means that the City was required to pay Utility in full. The City is correct in stating that the contract does not provide for a specific retainage percentage for everything installed by the contractor; however, Article 27 of the contract allows the City to withhold payments if the work has been done improperly.[8] Furthermore, the contract terms "total amount due" do not necessarily mean the entire amount due as claimed to be satisfactorily completed by the contractor with no checking, testing, or inspecting that any of it actually functions correctly; it can easily be read to denote the amount "properly" due, in other words, the amount due for all work meeting all contract requirements and specifications.

### 2. Inspection provisions

Article 13, paragraphs 2 through 4 of the Original Contract address the issue of site and work inspections. They state:

> The owner will appoint such person or persons as he may deem necessary to properly inspect the materials furnished and work done under the contract, and to see that the same strictly correspond with the drawings and specifications and bid documents. Work and materials will be inspected promptly, but if, for any reason delay should occur, the contractor shall

have no claim for damages or extra compensation.

> The failure of the inspector to reject or condemn improper materials and workmanship shall not prevent the owner from rejecting materials and workmanship found defective at any time prior to the final acceptance of the completed work, nor shall it be considered as a waiver of any defects which may be discovered later, or as preventing the city at any time prior to the expiration of the guarantee period from recovering damages for work actually defective.

> If the contract documents, owner's instructions, laws, ordinances, or any public authority require any work to be specifically tested or approved, the contractor shall give the owner timely notice of its readiness for inspection and, if the inspection is by another authority than the owner, of the date fixed for such inspection, inspections by the owner shall be promptly made....

Gen'l Condns. art. 13, ¶¶ 2–4, at GC–6; *see also* Gen'l Reqmts. § 1.08(B)(2)–(4), at p. 01000–22 (which repeats most of this language). Article 13 of the contract merely provides safeguards for the City in the event that the City delays making an inspection in a timely manner or overlooks some defect in making an inspection or in conducting a test. In no sense can it be said that Article 13 lessens the obligation of the City to inspect and test—in fact, it again reasserts the City's responsibility to inspect and test.

Furthermore, the Court cannot interpret the provision as being a complete disclaimer, thus implying that the City has no duty to inspect during the lifetime of the project,

---

7. The Defendant argued at trial that the second sentence should be read as explaining the first. In other words, the City was only certifying that it had checked the quantity of work being submitted for payment, not the quality. The Court finds that the more reasonable interpretation of these two sentences is that the terms "inspected" and "deemed acceptable as per specifications" in the first sentence mean just that—that the work has been inspected and meets the specifications as described in the contract. The second sentence then certifies that (1) the quantities requested to be paid for are correct (and these may include some items that may not require inspec-

tion and testing under the terms of the contract, such as tree stump removal) and (2) the types of materials are in accordance with the contract (which itself seems to necessitate some sort of inspection).

8. Article 27, entitled "Payments Withheld," reads: "The Owner may withhold or, on account of subsequently discovered evidence, nullify the whole or part of any payment to such extent as may be necessary to protect himself from loss on account of: (A) defective work not remedied ..." Gen'l Condns. art. 27, at GC–14.

because this interpretation would be patently inconsistent with other contractual provisions. For example, another general condition of the contract, Article 39, *requires* the engineer or owner to make reasonable inspections in order to make sure the project is in accordance with the contract.[9] Moreover, a number of provisions in the Specifications section of the contract also require testing. One such section provides that "[t]ests shall be conducted on short sections of sewer line; i.e., between manholes or at the end of each day's work" and "[i]nstallation of sewers will not be permitted at a point more than 2,000 feet ahead of any section of sewer or any manhole which has not been given the final test and accepted." Sanitary Sewer System Specs. § 3.15(A), at p. 02730–12. This provision is very specific and clearly requires testing; in fact, some sections of sewer that the City paid for in full were clearly in violation of the distance limitation. Therefore, to reconcile the terms in Article 13 with Article 39, the measurement and payment provisions in the General Requirements section, and the specific testing requirements in certain sections of the specifications, Article 13 cannot be read to be a complete disclaimer of the City's duty to inspect.

In this case, therefore, the Court finds that the inspector and the engineer, and through them the City, did not perform reasonable inspections and tests which are required under the contract prior to the complete payment to the contractor. Thus, those payments were prematurely paid and were not in accordance with the contract.

### B. Virginia law

█ The leading Virginia case addressing a surety's discharge is *Southwood Builders,*

*Inc. v. Peerless Ins. Co.,* 235 Va. 164, 366 S.E.2d 104 (1988). In *Southwood,* the Virginia Supreme Court held that the surety was discharged from its performance bond obligations where the contractor paid the subcontractor without the required architect approval. *Id.* at 171, 366 S.E.2d 104. The Court stated that in order for a compensated surety to be discharged from its liabilities, the surety must show a material variation from the contract by the owner. *Id.* at 169, 366 S.E.2d 104. "Payments of substantial sums before they are due ... are generally held to be such variations in the terms of the contract as will discharge the surety from its obligations to the owner." *Id.* at 170, 366 S.E.2d 104 (citing *American Sur. Co. v. Plank & Whitsett, Inc.,* 159 Va. 1, 10, 165 S.E. 660 (1932)). The policy reason behind this rule is that such a poor payment procedure both "diminishes funds that should have been available to the surety in case of default," *id.,* and "undermines the inducement to the contractor to finish the work on schedule," *id.* at 171, 165 S.E. 660. The *Southwood* court was also struck by the amount of overpayment in comparison to the original contract price.

In its legal arguments, the Defendant predominantly relied on a number of non-binding cases from other jurisdictions. Most of these cases discuss issues that are irrelevant and immaterial to this case, such as the necessity of showing actual or substantial prejudice to the surety,[10] the effect of an owner's good faith reliance on a third-party certification,[11] and the inspection requirement exception when a defect is "concealed" until completion.[12] One of the cases Defendant cited actually appears to support the Plaintiff's position. A Washington court, in applying its suretyship law (which is similar

---

**9.** The exact language is as follows: "**The engineer** and/or **owner** shall make periodic visits to the job ... He will carry out reasonable inspections of the work to determine if, in general, the contractor is proceeding in accordance with the contract documents. The owner may stop the work whenever such stoppage may be necessary to insure the proper execution of the contract. He shall also have authority to reject all work and materials which do not conform to the contract ..." Gen'l Condns. art. 39, at GC–18.

**10.** The *Southwood* court held that a showing of prejudice is unnecessary because "a material deviation, in itself, establishes sufficient prejudice." *Southwood,* 235 Va. at 170, 366 S.E.2d 104.

**11.** Here, the City relied on its own employees' certifications.

**12.** In this case, the defects were not alleged to be "concealed." To the contrary, a few witnesses testified that some of the defects were obvious and were spotted during a brief "walk-through" of the site.

to Virginia's law in certain respects), stated that "[w]hile mere errors of judgment which do not materially and substantially alter the contract do not release the surety, an abdication by an owner of its inspection responsibilities ... will discharge the surety *pro tanto* to the extent of the surety's prejudice." *Transamerica Ins. Co. v. City of Kennewick*, No. C–81–541–JLQ, slip op. at 7 (E.D.Wash. Sept. 20, 1984), *aff'd*, 785 F.2d 660 (9th Cir. 1986).

At trial and in its brief, the Defendant argued that extrinsic evidence should be admitted as to custom of the trade. The Court allowed the evidence into the record, subject to a determination of its admissibility. Under Virginia law, extrinsic evidence is admissible to supplement or explain a contract only when it is consistent with the express terms of the contract. VA.CODE.ANN. § 8.1–205(4) (Michie 1992); *Chas H. Tompkins Co. v. Lumbermens Mut. Casualty Co.*, 732 F.Supp. 1368, 1374–75 (E.D.Va.1990); *see also Seoane v. Drug Emporium, Inc.*, 249 Va. 469, 475, 457 S.E.2d 93 (1995) (when a contract is unambiguous, "commercially reasonable" considerations are irrelevant). In this case, the Defendant sought the admission of the custom of the trade in order to contradict the terms of the contract. The Court, therefore, now holds that the extrinsic evidence was inadmissible, and it will not be considered.

Applying Virginia law to this case, the Court concludes that Continental is a compensated surety and thus, in order to recover its losses, must prove that the City materially deviated from the contract. As discussed previously, the contract required the City to make reasonable and prompt inspections before paying Utility the full price for material installed. In consistently paying Utility 100% of the price of the installed items before testing them, the City paid substantial sums (over $640,000.00) before they were due. Under *Southwood*, this was undoubted-

ly a material variation from the contract and consequently Continental was discharged from its obligations to the extent that it was prejudiced by the City's actions.

Furthermore, the *Southwood* court's policy arguments—its concern that premature payments both diminish available contract funds and reduce the incentive for the contractor to complete his project—apply equally here. Because of the City's premature payments, the project's funds had been significantly decreased to the detriment of the surety. In addition, the City's policies encourage contractors to "take the money and run." In fact, one of the Defendant's witnesses, Precon's owner, admitted that as the contractor of a project, he would take any and all money paid to him by the City, even if undeserved. Similarly, the City's payment and inspection procedures do not induce the construction contractor to finish the work on schedule or at all. The City is apparently unconcerned with its defective payment and inspection procedures because, as one of its employees stated, "The project has a surety."[13] For policy reasons, therefore, this Court also finds that the City materially deviated from the contract, thereby discharging the surety's obligations under the contract to the extent that it was prejudiced by the City's premature payments.

### C. Consulting fees

Plaintiff sought to recover the costs ($23,573.02) it paid to its engineering consultant to review and analyze the defect repair requests.[14] This sum does not include amounts paid to its consultant for the rebid work. These expenses were foreseeable as a result of the material variation from the contract and flowed naturally from the City's breach of the payment provisions. The City did not present evidence rebutting this claim nor did it argue against the granting of these consulting fees in its Post–Trial Memorandum. The Court, therefore, awards the Plaintiff $23,573.02 in consulting fees.

---

13. The City's Project Engineer, testified that he did not mind paying the contractor early or paying for defective work because the surety would always be available to complete the job and/or pay for the repairs.

14. The Defendant had counterclaimed for a similar award—the additional administrative costs it incurred because of Utility's default. At the end of the trial, however, the Defendant withdrew its request.

## D. Prejudgment interest [15]

In a case based on diversity, state law controls a party's entitlement to prejudgment interest. *United States v. Dollar Rent A Car Sys., Inc.*, 712 F.2d 938, 940–41 (4th Cir.1983); *McClung v. Smith*, 870 F.Supp. 1384, 1409 (E.D.Va.1994). The Virginia Code provides that "in any action at law or suit in equity ... the judgment or decree of the court may provide for interest on any principal sum awarded, or any part thereof, and fix the period at which the interest shall commence." Va.Code.Ann. § 8.01–382 (Michie 1992). This statute has been interpreted as granting courts complete discretion in awarding prejudgment interest. *Dairyland Ins. Co. v. Douthat*, 248 Va. 627, 631, 449 S.E.2d 799 (1994); *McClung*, 870 F.Supp. at 1409.

The Court is hesitant to award any party prejudgment interest in a case such as this, where the problems arose over the interpretation of a contract, prejudgment interest is high, and both parties acted in good faith. This is consistent with prior caselaw in which district courts have denied prejudgment interest when a bona fide legal dispute existed, *Hewitt v. Hutter*, 432 F.Supp. 795, 800 (W.D.Va.1977), *aff'd*, 568 F.2d 773 (4th Cir.1978) and 574 F.2d 182 (4th Cir.1978); *see also McDevitt & Street Co. v. Marriott Corp.*, 754 F.Supp. 513, 515 (E.D.Va.1991) (court should weigh equities when deciding to grant prejudgment interest), *aff'd in part and rev'd in part*, 948 F.2d 1281, although other courts have held that the denial of prejudgment interest in such a situation is not required under the statute, *Gill v. Rollins Protective Servs. Co.*, 836 F.2d 194, 199 (4th Cir.1987); *McClung*, 870 F.Supp. at 1409.[16] The Court in its discretion, therefore, for the above-mentioned reasons, **DENIES** the award of prejudgment interest to the Plaintiff.

## E. Liquidated damages claim

In addition to the damages requested in the trial stipulation, the Defendant also asked the Court to grant its claim for liquidated damages. The Defendant's view was that the Original Contract still should be read to require Utility and its surety to be responsible for the Original Contract deadline. Defendant also argued that even if the City waived damages for the time Precon was working on the contract, it did not waive damages for the time between the default and the beginning of Precon's work on the project.

After the Defendant's evidence was put on, the Plaintiff moved for a directed verdict on this issue. Plaintiff relied on the Tri–Party Agreement which it argued expressly extended the completion date for 120 days. In addition, Plaintiff asserted that the Tri–Party Agreement also excluded the defect repairs from the timing provisions.

The Court finds the Plaintiff's interpretation of the Tri–Party Agreement to be correct. The Agreement states that

"[t]he City agrees to extend the Completion Contract completion date to 120 days after the Completing Contractor receives a written notice to Proceed on the Completion Contract. City agrees that completion of warranty and latent defect work authorized by the surety and performed by the Completing Contractor pursuant to Paragraph 2 herein is not subject to the 120 days completion date or the liquidated damages clause."

TPA ¶ 19, at 8. The "paragraph 2 warranty and latent defect work" referred to in the above paragraph is Utility's work "determined to be defective or incomplete under the Original Contract work." *Id.* at 3. The Plaintiff, therefore, was correct in asserting that the contract extended the completion date. Furthermore, even though the project was completed approximately four (4) months

---

15. The Plaintiff argued that the Defendant had conceded this issue by not discussing it in its post-trial memorandum. This argument is flawed because at trial both parties agreed that the prejudgment interest claim was not a part of the stipulation and its imposition was within the Court's discretion.

16. As the *Rollins* court noted, the Virginia Supreme Court, the final arbiter of this state law question, has not yet spoken on the issue. 836 F.2d at 199.

after the 120 day extension period, the additional time fell within the paragraph two exclusion. At trial, Mr. Fussell, the owner of Precon, and Mr. Lambert, the Continental supervisor who handled the Utility default claim, both testified that the extra four months of work was due to the large amount of defect repairs Precon was authorized to perform pursuant to Paragraph 2 of the TPA. This testimony was unrebutted. Thus, the Court finds Plaintiff's argument meritorious and **GRANTS** the directed verdict on the issue of liquidated damages.

### F. Declaratory Judgment

The sewer project has now been completed and has been accepted by the City without reservation. The Court, by this Order, has addressed all the outstanding claims and counterclaims of the parties. The Court finds no grounds for or any necessity for a further declaration as to the rights of the parties and declines to enter a declaratory judgment as requested by the Plaintiff.

### III. CONCLUSION

For the foregoing reasons, **JUDGMENT** is entered in favor of the Plaintiff against the Defendant in the amount of $252,720.68 (the stipulated amount of $234,827.68 less $5,679.97 as agreed to by the parties plus $23,573.02 for consulting fees). Defendant's liquidated damages claim and Plaintiff's prejudgment interest claim are **DENIED.** The Court also **DECLINES** to enter a declaratory judgment as requested by the Plaintiff.

The Clerk is DIRECTED to send a copy of this Order to all counsel of record.

It is so Ordered.